(No. 30163

CAPITOL BUILDING COMPANY *et al.*, Appellants, *vs.* THE CITY OF CHICAGO, Appellee.

*Opinion filed January 22, 1948.*

SCHUYLER & HENNESSY; JEROME J. SLADKEY, and GEORGE P. NOVAK, (EDWARD J. HENNESSY, and JAY STOUGH, of counsel,) all of Chicago, for appellants.

JOSEPH F. GROSSMAN, Acting Corporation Counsel, (JOHN J. MORTIMER, JOHN C. MELANIPHY, and FRANCIS S. LORENZ, of counsel,) all of Chicago, for appellee.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

This is an action to recover damages allegedly suffered as the result of the construction of the North State Street subway in Chicago. The appellants are, respectively, the owner and the lessee of a building located at the northeast corner of State and Randolph streets. The Capitol Building Company (herein referred to as the Building Company,) became the owner of the fee in the property in 1937, through a reorganization proceeding in the Federal court. At that time it was improved by a 19-story building which had been erected in 1891 and 1892. The original building was demolished in May and June, 1939, and in its place a 2-story building was erected, which the Walgreen Company occupies as tenant under a 20-year lease.

The action of the Building Company for damages to the old building was originally brought in the circuit court, while that of the Building Company and the Walgreen Company for damages to the new building was filed in the superior court. The actions were afterwards consolidated and tried together in the circuit court, without a jury, and judgment entered in favor of the city in both cases. An appeal was taken to the Appellate Court for the First District, where the judgments of the circuit court were affirmed. We allowed an appeal therefrom to this court.

The theories of the Building Company are, (1) that the proposed construction of the subway was the primary and moving factor in the decision to demolish the 19-story building, because of the uncertainty as to whether adequate protective measures could be undertaken which would prevent total collapse of the building, and that therefore it was entitled to receive the fair cash market value of the building at the time of demolition; (2) that in performing its duty to minimize its damage and protect the public, it was entitled to reimbursement at least for the cost of demolishing the building, plus the expense incurred in ob-

taining architectural and engineering advice in order to determine whether the building could be saved; (3) that in any event, it was entitled to recover $5000 for damage caused to the new building by construction of the subway; (4) that the new building received no benefit from the construction of the subway, and therefore there was nothing to offset against its damages; and (5) that if benefits did accrue, they could not be used as offsets because (a) they arose out of the operation of the subway by a third party, *i.e.,* The Chicago Rapid Transit Company, (b) the damages had occurred before the benefits accrued, and (c) the benefits were of a general and not a special nature. The theory of the Walgreen Company is that the construction of the subway resulted in structural damage to the extent of $3500 in the premises occupied by it, which damages cannot be set off because no benefits accrued to the premises by reason of the construction or operation of the subway.

The trial court, in a memorandum of opinion, found as a fact that the motivating reason for demolishing the old building was the nonprofitable history of operation, and that the demolition was not a proximate result of the construction of the subway. The trial court also found that, assuming the Building Company was fearful of the damages which might result to the building during the construction of the subway, the property could have been adequately protected against loss of support by the expenditure of $50,000. The court further found that the benefits accruing to the property by virtue of the construction of the subway amounted to $75,000, which was an amount sufficient to more than offset the damages suffered by the Building Company. These findings were approved by the Appellate Court.

It is at once apparent that the Building Company's claim for damages arising out of the demolition of the 19-story building cannot be sustained if the construction

of the subway was not the proximate cause of the demolition. There is ample support in the record for the finding of fact of the trial court in this regard.

The evidence shows that, at the time the decision to tear down the building was made, the Building Company was faced with several problems in addition to the problem of protecting against damage by the construction of the subway. The building was only 57 percent occupied, its operating statement for the 11 months ending November 30, 1938, showed a net loss of $8348.94, and it was estimated that renovation of the building needed to make its operation profitable would cost $300,000. The Building Company had secured estimates and bids on the shoring work needed to protect the structure during the construction of the subway, which indicated that a large expenditure of money would be required to protect the building from damage. At this stage, the Building Company on December 23, 1938, sent a letter to all holders of certificates of beneficial interest in the company, in which it notified them of the trustees' proposal to demolish the 19-story building and to erect a 2-story building in its place. The letter gives six reasons which the trustees advanced for favoring the proposal, as follows:

"1. The physical deterioration and obsolescence of the present structure render the expenditure of the substantial sum required for its preservation, in view of the construction of the subway, unwise.

"2. There is little prospect of being able to operate the upper stories of the structure profitably.

"3. The character of the structure and its occupancy is such as to render uncertain the continuing ability of the property to meet its fixed charges. Any disappointment in this respect might result in a default and foreclosure under the existing mortgage.

"4. In the absence of a sale of the property, the problem of replacing the existing building should be met within the near future. A majority of the trustees have felt that it would be better to take action now before the expenditure of the substantial sum required to support and preserve the existing building occasioned by the construction of the subway.

"5. Upon the expiration of the existing ground floor leases, the space could not be advantageously rerented without giving leases for substantial periods of time. If such leases are given, the opportunity of replacing the existing building with a more effective improvement will be indefinitely postponed.

"6. The new building will give much greater security for the payment of fixed charges and the preservation of the investment of the stockholders. This opinion is fortified by the expressed willingness of one of the largest and most conservative insurance companies in the country to make the new loan."

From the foregoing it would appear that the chief concern of the Building Company in 1938 was to get its property back on a profitable operating basis, and that the trustees were convinced that such a goal could not be achieved with the old 19-story building. If the protection of the building alone was the chief consideration, that result could have been accomplished by shoring and the construction of caissons at considerably less expense than the amount involved in tearing down the old building and erecting a new one. The trial and Appellate courts have already found as facts that the Building Company demolished the 19-story building for reasons largely unconnected with the construction of the subway. We cannot disturb those findings so long as there is evidence to support them. (*Merlo* v. *Public Service Co.* 381 Ill. 300; *Seiders* v. *Henry,* 347 Ill. 467.) The record before us contains such evidence. It therefore follows that the Building Company is not entitled to reimbursement for the value of the building which it demolished or the cost of demolition, because the construction of the subway by the city was not the motivating factor for the demolition. It likewise follows that the Building Company having torn down its building before the subway construction reached that vicinity, it cannot claim to be entitled to the cost of shoring and otherwise safeguarding a building that no longer existed. We cannot award damages on the basis of a speculation as to what the Building Company's expense might have been if it had pursued a course of action other than the one adopted.

There remains for consideration the question of the claim for damages to the new building allegedly arising out of the subway construction work. These damages consisted principally of cracks in the plaster and masonry in the subsidewalk vaults and elsewhere in the building. The total damages of this nature claimed by both appellants is $8500. The trial and Appellate courts, both finding the property to have been benefited to the extent of $75,000 by the construction of the subway, held that the benefits more than offset any possible damages, and denied appellants recovery.

It has long been established that where property is damaged but not taken for public use, the court in determining the extent of damages must also consider the benefits which the property receives as a result of the improvement. (*Kane* v. *City of Chicago,* 392 Ill. 172; *Department of Public Works* v. *Barton,* 371 Ill. 11; *City of Elgin* v. *Eaton,* 83 Ill. 535.) We must, therefore, turn again to the record to determine whether there is support in the evidence for the findings of benefits by the trial and Appellate courts.

Four witnesses testified on the question of the value of the land before and after the construction of the subway. For the appellants, one witness gave as his opinion that there had been no change in value, while another testified that the value had increased $300,000, but that the increase was due to increased values generally throughout the area and was not attributable in any way to the construction of the subway. For the appellees, two witnesses testified that the property had increased from $380,000 to $400,000 in value, and that $200,000 to $250,000 of this increase was attributable to the subway. The evidence also showed that the premises were well served with public transportation prior to the construction of the subway, being on streetcar and bus lines and only a short distance removed from the Illinois Central suburban station and the

elevated lines. On the other hand, there was evidence that the subway made the building site more readily accessible to residents of certain sections of the city, and that during the 11-month period following the opening of subway service the total fares paid at the two closest elevated stations, and the subway station in front of the building, showed a 25 per cent increase over the number of fares paid at the elevated stations alone in the preceding 11-month period. This is an indication of increased pedestrian traffic at the building site, possibly occasioned by the operation of the subway, which would tend to increase its value as a commercial location. We cannot say that the trial and Appellate courts, in fixing a value of $75,000 on the benefits resulting from the construction of the subway, were not justified by the evidence in doing so.

Appellants argue that the benefits, if any, arise out of the operation of the subway, rather than out of its construction, and that since the operation is in the hands of the Chicago Rapid Transit Company rather than the city, the city is not entitled to offset those benefits. We agree with the Appellate Court that this argument is unrealistic, and that construction of the subway tubes cannot be considered apart from the operation of the trains. The subway tubes were constructed solely for the purpose of operating subway trains, and would not have been built unless such use was contemplated. It was certain when they were built that trains would be operated in them. Thus the certainty of benefits arose when the subway was constructed regardless of the agency ultimately licensed by the city and the Commerce Commission to utilize the facilities provided by the subway tubes.

Appellants also contend that the benefits to the premises here involved are general rather than special, and hence cannot be offset against the damages to the property, in accordance with the rule frequently stated by this court. (*Chicago, Peoria and St. Louis Railway Co.* v. *Aldrich,*

134 Ill. 9.) Increase in the value of property is a benefit which is properly offset against damages, however. The measure of damages in a case of this kind, is the difference in value of the premises before and after the improvement. *Kane* v. *City of Chicago,* 392 Ill. 172; *Osgood* v. *City of Chicago,* 154 Ill. 194; *City of Elgin* v. *Eaton,* 83 Ill. 535.

Although the Appellate Court held that the trial court erred in admitting testimony concerning future subway plans for new construction and for connection with existing subways, there is still ample evidence without that to justify the finding of the trial court that the property value was increased and the Building Company thereby benefited to the amount of $75,000. The same considerations which increased the value of the fee owned by the Building Company would also operate to increase the value of the Walgreen Company's leasehold interest.

For the reasons expressed, it is apparent that the claims of appellants cannot be sustained. The judgment of the Appellate Court is therefore affirmed.

*Judgment affirmed.*