DEPARTMENT OF PUBLIC WORKS AND BUILDINGS, Petitioner-Appellee, *v.* CARL G. KLEHM *et al.*, Defendants—(LEE N. ROMANO *et al.*, Defendants-Appellants.)

(No. 56079;

First District—June 19, 1972.

*Rehearing denied September 7, 1972.*

Concannon, Dillon, Snook & Morton, of Chicago, (William R. Dillon and John B. Dillon, of counsel,) for appellants.

William J. Scott, Attorney General, of Chicago, (Frank S. Righeimer, Jr., and Calvert J. Gordon, Special Assistant Attorneys General, of counsel,) for appellee.

Mr. JUSTICE BURKE delivered the opinion of the court:

This was an eminent domain proceeding filed on July 8, 1968, by the Department of Public Works and Buildings of the State of Illinois to acquire 20.651 acres of an 85.958 acre tract of land situated in the northwest portion of Cook County, which was to be employed in the construction of an interstate highway. Named as defendants in the petition to condemn were Carl G. Klehm, the owner of the tract; Schaumburg Planet Project Corporation, which was under contract to purchase the tract; and Lee N. Romano, president of Schaumburg Planet Project Corporation. The jury returned a verdict awarding the sum of $454,300 as compensation for the 20.651 acres taken, and further finding no damages resulting from the taking to the remainder of the tract. Lee N. Romano and Schaumburg Planet Project Corporation (hereinafter referred to as "defendants") prosecute this appeal from the judgment entered on that verdict.

The 85.958 acre tract of land in question (hereinafter referred to as "subject property") was located at the southwest corner of the intersection of Illinois Route 72 and Illinois Route 53, commonly known as Higgins Road and Rohlwing Road, respectively. The subject property was essentially rectangular in shape at the time of the filing of the petition to condemn, and had an east frontage of some 2,665 feet along Rohlwing Road and a north frontage of some 1,082 feet along Higgins Road; not included in the subject property was a small parcel of land at the immediate corner of the intersection, measuring approximately 205 feet by 189 feet. The 20.651 acres taken by the State was the easternmost and the northernmost portions of the subject property, fronting both on Higgins Road and on Rohlwing Road. At the time of the filing of the petition to condemn, the subject property was employed by Klehm in the growing of nursery stock.

It was contemplated that the interstate highway was to be constructed upon Rohlwing Road, and that Higgins Road was to be widened and improved. Four exit/entrance ramps were to be constructed providing access to and from the interstate highway and Higgins Road. The north,

northeast and east perimeters of the subject property remaining after the taking, was to be serviced by a frontage road paralleling the south line of Higgins Road, the southwest interstate highway entrance ramp, and the west line of the interstate highway. Access to the frontage road was to be provided from the south line of Higgins Road upon Martingale Road, a north-south road which partly bordered the west line of the subject property.

The subject property was located in an area devoted mostly to farming at the time of the filing of the petition to condemn. To the east of the subject property, across Rohlwing Road, was a 3,500 acre forest preserve area. To the north of the property, across Higgins Road, was vacant, unused land. On the northeast corner of the intersection was a dormant gasoline filling station and a food stand, and on the southeast corner of the intersection was a second dormant filling station. To the south of the property was farmland. To the west of the property and south of Higgins Road was a small residential area, to the west of which was vacant land, and about three miles west of the subject property were the residential areas of the Village of Schaumburg. About one half mile to the northwest of the subject property was the proposed Woodfield Mall shopping center, the construction of which had not commenced at the time of the filing of the petition to condemn but which was under construction at the time that the jury viewed the subject property during the trial of this cause.

There was some commercial and industrial development in the area about a mile north and west of the subject property prior to the filing of the petition, but it does not appear that there was development in the immediate area of the subject property between the time of the filing of the petition and the time of the trial of this cause. About a mile and a half to the north of the property, on Rohlwing Road, there was a full cloverleaf interchange on the Northwest Tollway.

Three appraisal witnesses testified for the State at the trial of the cause. James Curtis testified that he had appraised several properties in the general area of the subject property, that he was familiar with land values in the area, and that the highest and best use of the property was as a planned multi-family development, with a density of use of not more than twenty units per acre. He testified that the value of the subject property was $1,719,000 and that the value of the part taken was $413,000. He further testified that there was no damage to the remainder after the taking, but that there was an increase in value to the remainder after the taking of $65,500.

Charles Hodlmair testified that he had lived in the area of the subject property all of his life, and that he had been in the real estate business

in the area for over 25 years. He testified that the highest and best use of the subject property was as a combination of uses under a planned development zoning, having a density of use of from ten to fourteen units per acre. The witness stated that the value of the subject property was $1,547,244, that the value of the part taken was $371,718, that there was no damage to the remainder after the taking, and that there was an increase in value to the remainder of $130,614.

Edward Smith was the third valuation witness for the State. He testified that he resided about five miles from the subject property, and that he had been in all phases of the real estate business in the area for over forty years. He testified that the value of the subject property was $1,633,200, that the value of the part taken was $392,400, that there was no damage to the remainder after the taking, and that there was an increase in the value of the remainder after the taking of $65,200.

Two appraisal witnesses testified for the defendants. William McCann testified that he had appraised the property across the road from the subject property, that he lived forty or fifty miles from the area of the subject property, and that he officed about thirty miles away. The witness' estimate of the highest and best use of the subject property was as a high intensity, planned unit development for multiple family dwelling, office and retail uses, at fifty units per acre. He estimated that the value of the subject property was $4,300,000, that the value of the part taken was $1,025,000, that the damage to the remainder was $2,292,500, and that there was no increase in value to the remainder resulting from the taking.

Ralph Martin testified that he was a real estate broker since 1957 and that he officed several miles from the subject property. The witness testified that the value of the subject property was $4,300,000, that the value of the part taken was $1,030,000, that the damage to the remainder was $2,070,000, and that there was no increase in value to the remainder resulting from the taking.

The parties called several other witnesses who testified as to soil conditions on the subject property, traffic conditions on the bordering highways, sanitary facilities in the area, zoning, and the like.

Four months prior to the filing of the petition to condemn, Klehm entered into an "Installment Contract to Purchase Real Estate" and a "Supplemental Agreement" with the defendant Schamburg Planet Project Corporation for transfer of title to the subject property.

The "Installment Contract to Purchase Real Estate" (hereinafter referred to as "Installment Contract") provided in part that the purchase price of the subject property was $1,700,000, payable as follows: $10,000 down; $990,000 by bank draft upon the "first closing"; $350,000, with

interest, payable at the "second closing"; and $350,000, with interest, payable at the "third closing." A provision was incorporated into the contract relating to the dates to be set for the three "closings."

The Installment Contract further provided that title to the subject property would be guaranteed by the Chicago Title & Trust Company, at seller's expense, in the amount of the purchase price, and that title to the property would be transferred as follows: a designated forty acres to be transferred by recordable warranty deed at the "first closing"; a designated twenty acres to be transferred by recordable warranty deed at the "second closing"; and the balance of the subject property to be transferred by recordable warranty deed at the "third closing."

The Supplemental Agreement, entered of even date with the Installment Contract, provided in part for the termination of "this contract" and the return to purchaser of the earnest money "deposited hereunder" in the event of failure to secure a designated re-zoning of the property and/or in the event of the failure to secure a hookup agreement with the sanitary district authorities. The Supplemental Agreement also provided that, at the option of the seller, the seller had the right to designate parcels of real estate in northeastern Illinois for acquisition by the purchaser, with purchaser's own funds, which parcels of real estate would in turn be transferred to the seller by the purchaser in return for the subject property, and that any funds expended by purchaser in the acquisition of those other parcels of land (except attorney fees) shall be "allowed (as) a credit against the purchase price" set out in the Installment Contract.

The Supplemental Agreement further provided that in the event of the condemnation of all or part of the subject property, the seller shall satisfy his obligation to convey to the purchaser that part taken by turning over to the purchaser the condemnation award; that the purchaser was obligated to conduct all litigation in connection with any condemnation proceeding, in which seller would fully participate; and that

"* * * if the award per acre received in the condemnation proceeding is less than the per acre value established by said Installment Contract to Purchase Real Estate, purchaser shall pay to seller a sum equal to the difference between the price per acre established by the said Installment Purchase Contract and the price per acre received in the condemnation proceeding times the number of acres involved in said condemnation proceeding; and

* * * if the award per acre received in the condemnation proceeding is more than the per acre value established by said Installment Contract to Purchase Real Estate, seller shall pay to purchaser a sum equal to the difference between the price per acre established

by said Installment Purchase Contract and the price per acre received in the condemnation proceeding times the number of acres involved in such condemnation proceeding."

Defendants initially contend that the trial court committed reversible error in allowing, over their objection, the two contracts alluded to above to go to the jury as evidence of the value of the subject property, inasmuch as they involved exchanges of real estate rather than an outright, on-the-market cash sale. We disagree.

■■ The use of sales of comparable real estate as evidence of the value of the real estate sought to be condemned has long been established, and the admissibility of such evidence must be determined by the trial court within the proper limits of the court's discretion. (*City of Evanston v. Piotrowicz*, 20 Ill.2d 512, 522, 170 N.E.2d 569, 575.) That the contracts called for the sale, rather than the exchange of the subject property with other parcels of real estate, cannot be seriously disputed. Analysis of the contracts reveals that the parties thereto intended to treat the transaction as a cash sale of the subject property.

The Installment Contract sets a "cash purchase price" for the subject property of $1,700,000, payable in installments. It is designated in its caption as an installment contract to "purchase" real estate, incorporates within its body the terms "sell" and "purchase," and designates the parties thereto as "seller" and "purchaser."

Likewise in the Supplemental Agreement the terms "sale," "purchaser" and "seller" are employed. The intent of the parties to the contracts, that the transfer of the subject property was to be for an established cash price, is manifest in the portion of the Supplemental Agreement dealing with the question of the condemnation. The parties there agreed that in the event that the award received per acre in the condemnation proceeding was lower than the "per acre value *established* by said Installment contract to Purchase Real Estate" then the purchaser should pay to the seller a sum equal to the difference between the two said amounts, and that the reverse would obtain in the event the award price per acre was higher than the "price per acre *established* by such Installment Purchase Contract." (Emphasis supplied.)

The fact that the Supplemental Agreement provided an option to the seller to designate other parcels of real estate for the purchaser to purchase for and deed to the seller has little to do with the fact that the parties ultimately intended a cash sale of the subject property. The trial court did not abuse its discretion in allowing the contracts to go to the jury as evidence of the market value of the subject property at the time of the filing of the condemnation petition.

The cases cited by the defendants in support of their position are in-

apposite on their facts to the case at bar inasmuch as they involve transfers of real estate on bases other than for the fair cash market value. See *Sanitary District v. Boening*, 267 Ill. 118, 107 N.E. 810; *Jefferson Park District v. Sowinski*, 336 Ill. 390, 168 N.E. 370; *Lanquist v. City of Chicago*, 200 Ill. 69, 65 N.E. 681; *People ex rel. Department of Public Works v. Reardon*, 7 Cal.App.3d 856, 87 Cal Rptr. 160.

Defendants next contend that the tactics employed by counsel for the State were prejudicial and resulted in a denial of their right to a fair and impartial jury trial. They argue that counsel for the State sought to impeach one of their valuation witnesses on cross-examination by employing non-impeaching matter as though it were impeaching, in that the witness was questioned concerning a valuation which he made in the past in connection with property across the road from the subject property.

■■■ This line of questioning was acquiesced in by defendants' counsel when, after objecting to the questioning, he stated, "Let him answer. Let him explain." Defendants' counsel also pursued the same line of questioning on the re-direct examination of the witness. Further, no objection was made to the questioning of the witness by counsel for the State with regard to the witness' familiarity with the Code of Ethics of the American Institute of Real Estate Appraisers. Defendants cannot now be heard to complain in this regard. *Forest Preserve Dist. v. Chicago Title & Trust Co.*, 351 Ill. 48, 56, 183 N.E. 819, 822.

■■ Defendants next argue that counsel for the State asked questions of the State's valuation witnesses which gave the appearance that they predicated their opinions as to the value of the subject property upon the values of similar properties, whereas there was no evidence introduced as to the values of comparable property. On the contrary, evidence was introduced relative to the contracts for the cash sale of the instant property, entered into just four months prior to the filing of the petition to condemn. Since this was a cash sale of the premises just a short period of time prior to the filing of the petition, further evidence of comparable sales of real estate would appear unnecessary. The questions asked by counsel for the State in this regard were either not objected to by defendants' counsel or were not of such character as to have prejudiced the defendants in the eyes of the jury. See *Forest Preserve Dist. v. Chicago Title & Trust Co., supra*.

Defendants also argue that the tactics by counsel for the State continuously placed defense counsel in the position of having to raise objections in the presence of the jury.

■■ Objections raised by defendants' counsel to several questions asked by counsel for the State of two of the State's witnesses were sustained by

the trial court, and testimony was ultimately elicited from those witnesses in a manner consistent with the objections so interposed. It does not appear from the record that counsel for the State "deliberately employed (such questions) as a means of forcing counsel for Appellant to be placed in a position, in the presence of the jury, of continuously having to make objections," as defendants contend in their brief.

Defendants contend that the mode of proof employed by the State in attempting to show no damages to the remainder was intended and "may well have caused" the jury to deduct alleged benefits to the remainder as a result of the taking from the value of the part taken, contrary to law.

At a conference outside the presence of the jury, the trial court specifically stated to the counsel for the State that he would not be permitted to pursue a theory that an increase in value to the remainder caused by the taking could be employed as an offset against the value of the part taken, and it does not appear from the record that such a theory was thereafter pursued by the State. Not only is defendants' contention in this regard conjectural, as is indicated by their use of the phrase "may well have caused" in stating their contention, but it does not appear that they tendered any instruction to the trial court which would have offset the effect upon the jury which the pursuance of such theory is alleged to have caused.

The case of *City of Chicago v. Mecartney*, 216 Ill. 377, 75 N.E. 117, cited by defendants in support of this contention correctly states the law with regard to offsetting the value of land taken with the increase in value of the remainder, but it clearly has no application to the circumstances in the case at bar.

Defendants contend that the jury's verdict of no damage to the remainder after the taking was against the manifest weight of the evidence and was in part brought about by several allegedly erroneous rulings by the trial court.

■■ They initially argue that the trial court erroneously refused to strike the testimony of one of the State's witnesses who testified concerning vehicular access to the remainder based upon improved and widened roadway access from Higgins Road, since such improvement and widening were conjectural and speculative. On the contrary, defendants' own consulting engineer, Mr. Hansen, testified before the Village of Schaumburg Board of Trustees, in connection with an application for a re-zoning of the property, that an adequate traffic plan would be worked out to accommodate the proposed buildings and that certain improvements could be expected from the County in connection with the traffic pattern in the area. The justification offered by the defendants

in their brief of the representations made by Mr. Hansen to the Trustees, that "no such plan as had been hoped for could be worked out with the State," is unavailable, inasmuch as it finds no support in the record. Consequently, the trial court did not commit error in refusing to strike this testimony, nor did the court commit error in refusing to give Defendants' Instruction Number 18 to the jury regarding that subject and in substituting the court's own I.P.I. instruction in its stead.

Defendants also argue that there was no evidence adduced which showed any special benefits to the remainder brought about by the taking. The State adduced evidence that the remainder was more valuable after the taking than before the taking, that the remainder had a greater exposure to persons who might desire to work, live or patronize establishments and buildings constructed on the property, and that there was generally improved access to the remainder due to the taking, the construction of the interstate highway and the improvement of Higgins Road. The jury heard the evidence and rendered its verdict accordingly. See *Forest Preserve Dist. v. Chicago Title & Trust Co.*, 351 Ill. 48, 183 N.E. 819; *Capitol Building Co. v. City of Chicago*, 339 Ill. 113, 77 N.E.2d 28.

■■ Defendants finally contend that the valuation of the remainder by the State's witnesses was predicated upon sales of real estate located at full interchanges of other expressways, without a showing of comparability of those other properties to the subject property. Defendants did not interpose an objection that there was no showing that the other properties were comparable to the subject property. Defendants cannot now be heard to complain in this regard.

The other arguments and statements interspersed throughout the defendants' brief and reply brief have been considered by this Court and have been found to be without merit.

The evidence in this case was conflicting. The jury was presented with that evidence, viewed the subject property, and returned a verdict within the range of valuations set by the several witnesses.

Finding no reversible error, the judgment is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and LYONS, J., concur.