THE ILLINOIS STATE TOLL HIGHWAY AUTHORITY, Petitioner-Appellee, *v.* RAY HUMPHREY ESTATE *et al.*, Defendants-Appellants.

Second District   No. 76-328

Opinion filed July 21, 1978.

Tomas M. Magdich, of Keller & Magdich, of Dixon, for appellants.

William J. Scott, Attorney General, of Oak Brook (Malcolm E. Erickson, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

This appeal arises from an eminent domain proceeding in which the Illinois State Highway Authority (Tollway) sought to acquire 15.66 acres of the defendant Charles A. Hummel's land located about one-half mile

south of the city limits of Dixon in South Dixon Township, Lee County, Illinois. The entire tract owned by the defendant consisted of about 56 acres that had no structures of any kind located thereon. It was bounded on the east by Illinois Route 26, on the north by a gravel road known as Bloody Gulch Road, on the west by Dutch Road and on the south by a parcel of farm land. Prior to this proceeding the defendant's land had been bisected diagonally by the Illinois Central Railroad from northwest to southeast. The taking by the Tollway crossed the defendant's land in a generally east and west direction. By reason of the Tollway taking and the presence of the Illinois Central Railroad, the defendant's property was divided into four quadrants of unequal size and irregular shape as shown by the following sketch:

Prior to the taking, the defendant's parcel had 2700 feet of frontage on Route 26 and 900 feet of frontage on Bloody Gulch Road. In this proceeding, defendant's access rights were condemned along the entire taking; accordingly, defendant's access to and from Route 26 is limited to a frontage of approximately 670 feet at the southeast corner of the southeast quadrant of his land (see sketch). Additionally, access to Bloody Gulch Road was taken beginning at its intersection with Route 26 and

extending west for a distance of approximately 120 feet. On the west side of defendant's property, Dutch Road was converted to a dead-end road on each side of the tollway.

Again referring to the sketch, the tollway plans show a "trumpet interchange" directly across Route 26 from the northeast quadrant of the remainder of the defendant's land. All tollway traffic enters and exits from this point. Therefore, to gain access to the largest quadrant (northeast) of the defendant's remaining land from the trumpet interchange, it is necessary to travel north on Route 26 to Bloody Gulch Road and then turn west and proceed for a distance of at least 120 feet.

The construction of the tollway across the defendant's land changed its topography as the highway is elevated approximately 10 feet. Also, the tollway maintenance buildings are located on the east side of Route 26 in the interchange area opposite defendant's land. Public sewer and water lines from Dixon were brought by the Tollway to those buildings; these lines pass in the proximity of defendant's property in order to reach the maintenance building area. At the time the condemnation suit was filed, defendant's property was used for agricultural purposes and it was zoned for this use by the Lee County Zoning Ordinance.

The eminent domain proceedings were filed on August 18, 1971, and sought defendant's land as part of the extension of the East-West Tollway from a point approximately 4 miles west of Aurora to a point 1 mile east of Rock Falls. On October 6, 1971, a "quick take" order was entered; it found the value of the property taken to be $20,594.75 and it further found the damage to the remainder to be $24,144.75. These funds were deposited by the Tollway and withdrawn by the defendant. Defendant then cross-petitioned for a jury determination of damages to the remainder of his property. This extension of the East-West Tollway was opened for traffic in 1974. The trial of this case began on February 10, 1975; by reason thereof, the jury viewed the property sought in this proceeding after completion of the proposed improvement. The jury verdict found just compensation for the property taken to be $16,875; damages to the remainder were fixed at $4,050. The court then entered judgment on the jury's verdict and ordered defendant to repay the excess funds he had withdrawn, namely, $23,814.50; defendant appeals from this judgment.

The defendant presents six propositions for review by his appeal:

(1) That the volume of traffic at the interchange should not be considered in determining either damage or benefit to the remainder;

(2) Even if it were proper to consider the volume of traffic, the traffic survey data and opinion testimony based thereon were speculative and improperly admitted in evidence.

(3) Petitioner's valuation witnesses improperly considered estimates from the traffic survey made for the Tollway;

(4) A witness for the petitioner was improperly permitted to state an opinion as to the suitability of the remainder for certain uses although he had no knowledge of the local real estate market.

(5) The petitioner should have been compelled to answer defendant's request for admission of fact regarding the accuracy of the traffic survey; and

(6) The court permitted improper cross-examination of one of the defendant's witnesses.

The determination of the value of the remainder after construction of the improvement was the most critical finding made by the jury in this case. Two witnesses for the petitioner were of the opinion that there would be damage to the remainder due to triangulation (crop damage occasioned by equipment turns during cultivation), division, loss of access and grade elevation; however, they were also of the opinion that by reason of increased traffic and the availability of public sewer and water, there would be special benefits to the remainder after construction of the improvement. After consideration of the foregoing factors, both of petitioner's valuation witnesses concluded that the benefits more than offset the damages to the remainder. On the other hand, the two valuation witnesses who testified for the defendant found damage to the remainder of $28,600 and $30,000 respectively and neither of them found any special benefits by reason of the construction of the improvement. A comparison of this evidence with the jury finding of $4050 as damage to the remainder indicates that the jury determined that the damage to the remainder was substantially reduced by special benefits resulting from the construction of the improvement.

Petitioner's real estate witnesses testified that the highest and best use of the defendant's land before the improvement was farming but that after construction of the tollway the remainder was suitable for commercial use because of the increased traffic, the availability of sewer and water and its location near the interchange area. The defendant's real estate witnesses were of the opinion that prior to the improvement the agricultural zoning for this property was a type of "holding zoning" as the property had commercial or industrial potential. One of the defendant's witnesses stated that the tollway construction would limit the commercial potential of the remainder due to loss of access on Route 26. The other appraisal witness for the defendant was of the opinion that after the improvement the remainder would only be suitable for agriculture. No question in reference to the reasonable probability of rezoning was raised by the parties, and therefore we do not consider it here. See, however,

*Department of Public Works & Buildings v. Exchange National Bank*
(1975), 31 Ill. App. 3d 88, 334 N.E.2d 810.

Part of the Tollway's case consisted of the evidence deposition of Norman H. Wuestefeld, a vice president of Wilbur Smith & Associates, an organization engaged in making traffic studies and usage estimates for toll highways, bridges, airports and other facilities of this nature. Since other witnesses for the Tollway based portions of their testimony on Wuestefeld's estimates of tollway usage, his qualifications, methods and opinions are hereafter stated in some detail.

Mr. Wuestefeld testified that he was the director of the division of his firm that did studies relating to developing estimates of future usage and revenues of toll highways, bridges, airports and other highway facilities; that he has been so involved for 17 years; that he was a member of the Institute of Traffic Engineers; that he had prepared over 200 traffic studies; that his firm had worked with the Illinois Toll Highway Authority since 1954 on studies relating to the tollway system; that he had worked with the Indiana Toll Highway and other expressway systems in several other States. Mr. Wuestefeld further stated that in September 1970 he completed and submitted a report of a traffic and revenue study made by his firm covering extension of the East-West Illinois Tollway; that this study was performed under his overall direction and responsibility; that the study was designed to serve as a basic document for marketing the bonds sold to finance this extension; that the initial work involved a detailed survey in the area of the tollway extension which included a roadside interview survey whereby motorists on major highways in the area were interviewed; that the interviews were conducted in March of 1967 and the majority in June 1968 plus a few in March 1969; that the total number of interviews was 59,235; that the study further ascertained the number of vehicles moving through the various interview stations each hour by direction; that the results of this survey data furnished point to point movements throughout the area; that an economic review and overlay of the area served by the extension was made and people in the area of the proposed extension were interviewed at length; and that on the basis of this information an evaluation of growth of the corridor was made and used to develop estimates of future usage of this particular tollway extension.

Wuestefeld further testified that the full term of the study consisted of several man-years of effort; that over the period of the study well over 100 people were involved in making it and developing the findings; that based on the information compiled, he had an opinion as to the number of vehicles that would use the Route 26 interchange with the east-west extension on a daily basis for any particular year; that the base year used

for the study was the year during the majority of the roadside interviews and that was 1968; that in 1968 if the tollway had been completed, the total assignment of all ramps on the State Route 26 interchange would have been 1740 vehicles daily, which included both exiting and entering movements; he further stated that he had an opinion of the number of vehicles that would travel on a daily basis on the East-West Tollway extension at Route 26 during the year 1968, that the easterly traffic at the Route 26 interchange would be 2960 daily and the westerly traffic at the Route 26 interchange would be 3540 daily. He further stated that he had an opinion as to the number of vehicles that would use the Route 26 interchange on a daily basis for the year 1990 and that would be 9000 vehicles which would include all movements on all ramps. He stated that he did not include in his estimate the percentage of through traffic that might drive off the Route 26 interchange only for the purpose of refueling, eating or staying the night.

Defendant first contends that the increase or decrease in traffic resulting from the construction of the tollway and the interchange are not proper elements to be considered in determining whether or not there is damage or special benefit to the remainder. Defendant relies on *Department of Public Works & Buildings v. Mabee* (1961), 22 Ill. 2d 202, 174 N.E.2d 801, and *Department of Public Works & Buildings v. Bills* (1965), 66 Ill. App. 2d 170, 213 N.E.2d 110. In *Mabee* the traffic volume in front of the owner's gas station was substantially reduced by installation of a median strip in the highway. At page 205 the supreme court stated:

> "The inconvenience of a one-way traffic regulation may be greater in degree as to a person whose premises abut on the highway where such a regulation has been invoked, but this cannot be the basis for damages."

In *Bills*, the State sought to condemn 23.81 acres of the defendant's 396-acre farm, and to extinguish access rights. Prior to the condemnation, the defendant's land was divided by a township road called Route 15 running in a generally north and south direction. The planned construction provided for Interstate Route 80 and the widening of Route 15 with an overpass over Interstate Route 80. The State contended that the trial court committed prejudicial error in permitting the property owner's appraisers to consider increased traffic and increased traffic hazards in making a determination of their opinion as to the damage to the remainder. The court stated at page 176:

> "Since an abutting landowner has no property right in the flow of traffic past his premises, it follows that a modification of such flow of traffic by an increase thereof is a valid exercise of police power and does not result in compensable damage to the abutting land. Accordingly increased traffic is an improper element to be

considered in determining the depreciated value of land not taken." 66 Ill. App. 2d 170, 176.

Petitioner cites *Cuneo v. City of Chicago* (1948), 400 Ill. 545, 81 N.E.2d 451, and *Geohegan v. Union Elevated R.R. Co.* (1915), 266 Ill. 482, as standing for the proposition that Illinois has recognized increased vehicular and pedestrian traffic as a proper consideration bearing on the question of damage or benefit to the landowner's remaining property. More recently *Department of Public Works & Buildings v. Wilson & Co.* (1975), 62 Ill. 2d 131, 340 N.E.2d 12, decided the question as to whether deprivation of all direct access to a contiguous highway was compensable where there was a reasonable substitute access furnished by means of a frontage road. The *Wilson* court considered both the cases cited by the defendant here and the cases cited by the Tollway and observed that the right of access to an existing public road was a valuable property right which could not be taken away or materially impaired without justification. However, the court did not overrule the *Mabee* case; it was distinguished because there the property owner's free and direct access to the lane of traffic abutting his property had not been taken or impaired and the change in traffic volume was the result of the exercise of the State's police power.

■■■ Applying the reasoning of the above cases, it is our opinion that there is no question that defendant's access has been materially impaired as to Route 26 and a portion of Bloody Gulch Road. This being the case, under the authorities cited above, the defendant is entitled to recover damages caused by the material loss of access. Likewise, the petitioner is entitled to reduce or offset the damage to the remainder by any special benefits accruing to the defendant's property by reason of the construction of the improvement. In our view, the instant cause is more similar to *Wilson* in that there was a material impairment of access, and there is therefore involved more than a regulation of traffic pursuant to the State's police power. It is noted that defendant's witnesses, in testifying to the damage to the remainder, did consider the loss of defendant's access rights and the change in the flow of traffic; hence, the Tollway should also be entitled to have its valuation witnesses consider these same elements. This conclusion is consistent with several recent cases which have permitted benefits to offset or substantially reduce damages to the remainder. See *Department of Public Works & Buildings v. Klehm* (1972), 6 Ill. App. 3d 752, 760, 286 N.E.2d 558; *Department of Public Works & Buildings v. Exchange National Bank* (1975), 31 Ill. App. 3d 88, 104, 334 N.E.2d 810; *Department of Public Works & Buildings v. Todaro* (1967), 90 Ill. App. 2d 245, 250, 233 N.E.2d 61.

A second issue raised by the defendant contends that it was error to permit petitioner's witnesses to consider the traffic study and the estimates

based thereon because they were speculative, the volume of traffic being impossible of computation. In support of this proposition, the defendant cites *Department of Public Works & Buildings v. Divit* (1962), 25 Ill. 2d 93, 182 N.E.2d 749. In *Divit* the property owner's land was improved with a gasoline service station and a motel located on Illinois Route 54. A portion of this property was sought by the Department for an interchange with Interstate Route 57 which was being planned for future construction. The jury awarded the defendant damages for the property taken but found no damages to the remainder. The Department's witnesses had testified that any damage to the remainder would be offset by the special benefits inherent in the property's proximity to the additional traffic that would result due to the construction of an interchange with Interstate Route 57. One of the petitioner's witnesses stated that he found no damage to the remainder based solely on the expected increase in traffic; however, he admitted that he had no idea how much traffic there would be on Interstate Route 57 or when such benefits might result. A second witness for the petitioner arrived at the same result, namely, that benefits would offset any damage to the remainder because of the increase in traffic on both Interstate Route 57 and Route 54. He supported his opinion by the expectation that by 1970, automobile sales would total nine million per year. On appeal, the court considered the testimony of each of these witnesses and observed that neither of them had any idea when the freeway would be completed or the volume of traffic that could reasonably be expected thereon. The court acknowledged that damages to the remainder could be offset by special benefits but further stated that special benefits must be capable of measurement and computation; it concluded that the special benefits in this case were largely based on conjecture as the witnesses agreed it was impossible to predict the volume of traffic which would ultimately use Route 57, and when that volume would be reached; the court observed that "there were no facts presented from which such benefits could be reasonably computed."

■■ Expert testimony is permitted when (1) the opinion of the witness is distinctively related to a science, profession, business or occupation and is beyond the knowledge of an average juror; (2) the witness has sufficient skill, knowledge or experience in that field so that his opinion will probably aid the trier of fact in the search for truth; and (3) the state of the art or scientific knowledge permits a reasonable opinion to be asserted by an expert. (McCormick, Evidence §13 (2d ed. 1972).) The qualifications of Mr. Wuestefeld, as previously set forth, amply demonstrate that he had extensive experience and knowledge in the field of making traffic studies and drawing inferences and estimates therefrom. If traffic estimates are to be permitted in cases of this nature, then his background and

experience should be sufficient to qualify him to testify on such matters. The method of gathering the data used in making his estimates and opinions was explained in order to allow the jury to weigh his opinions; the trial court determined that information of this type might be helpful to the jury. The fact that prospective purchasers of tollway bonds might rely on such studies and opinions indicates that this type of evidence is used by persons in business in connection with making investments. Defendant had the right to cross-examine; it was up to the jury to determine the weight it desired to place upon his estimates and opinions. On the basis of the foregoing analysis, we hold that Mr. Wuestefeld was qualified to state his opinion of tollway usage based on the traffic survey and the methods used in securing the data; his testimony was properly received as it had an important bearing on one of the issues in this case.

■■ Defendant next asserts that it was error to allow the Tollway witnesses to consider the traffic estimates of Wuestefeld in arriving at their opinion of value of the remainder, as they had no personal knowledge of the traffic volume. As authority for this position, defendant cites *Village of Morton Grove v. Gelchsheimer* (1959), 16 Ill. 2d 453, 158 N.E.2d 70. In that case, a witness testified in detail as to the cost per property of a public improvement to be made by special assessment. A second witness then stated that each property would be benefited in the exact amount of the cost as computed by the first witness. The supreme court found this improper, as the second witness used the computations of the first witness in ascertaining the benefits accruing to each property. The case therefore holds that a valuation witness cannot rely on valuation figures supplied by another witness when such valuation is the ultimate issue. This is not the situation involved here. The volume of traffic as testified to by Wuestefeld was only one of many factors considered by the Tollway's witnesses in arriving at the damage and offsetting benefits to the remainder. In *Forest Preserve District v. Harris Trust & Savings Bank* (1969), 108 Ill. App. 2d 65, 247 N.E.2d 188, this court held that valuation witnesses in an eminent domain proceeding who relied on many factors in reaching their conclusion may give their opinion as to value in spite of the fact that one factor they considered was sales of which they had only hearsay knowledge. Applying the rationale from *Forest Preserve District* to the facts before us, we conclude that the testimony of the Tollway's witnesses was not rendered incompetent because one of many factors they considered was based on hearsay knowledge, namely, Wuestefeld's estimates of traffic volume.

Defendant next contends that a Tollway witness, Robert Schmeltzer, was improperly allowed to testify as to the suitability of the remainder for a specific use, although he had no personal knowledge of the local real

estate market. Schmeltzer had worked for two different companies in the previous 16 years, during which he had been in charge of purchasing real estate for restaurant and gas station locations in various States, including the Dixon area in Illinois. He examined the property in question and a photo of the same property prior to the construction of the tollway. He also considered the following factors: the division of the property into four quadrants; the location of the interchange in relation to Chicago and Dixon; the physical characteristics of the land; the location in relation to the entrance and exit ramps; the availability of sewer and water lines; and the volume of projected traffic. Schmeltzer testified that there were no comparable properties in the Dixon area because there was only one tollway interchange, and that other land values in Dixon were therefore unimportant. The trial court did not, however, allow him to testify as to comparable sales of other tollway interchange sites or as to his opinion of the value of the remainder. He did state that in his opinion the northeast quadrant of defendant's land was suitable for a commercial use after construction of the tollway.

■■ In our view this is similar to the situation which existed in *Department of Public Works & Buildings v. Bohne* (1953), 415 Ill. 253, 113 N.E.2d 319. In that case the testimony of a witness regarding the value of land for use as a trailer park was struck because the witness was not qualified as an expert in real estate values in the county where the property in question was located. The supreme court commented that anyone who knows the property and its value for certain uses and purposes may testify in such cases, and noted particularly that the witness had long been involved in the trailer park business; that she knew the particular property and that it had features which were peculiarly well suited for use as a trailer park; that city water and lights were available; that the witness' background and experience qualified her as an expert and that her experience with statewide land values as they pertain to the trailer industry was a proper basis for her testimony; and that her lack of experience in the area in question merely went to the weight of her testimony, not its admissibility. Accordingly, it is our belief that Schmeltzer's testimony was properly admitted, and that his lack of knowledge of local land values merely went to the weight of his testimony.

■■ The next issue we consider is whether the trial court erred in not requiring the Tollway to respond to a request for admission of fact. Three days prior to trial defendant filed a request to admit fact, asking the Tollway to admit that the traffic study (Wuestefeld's) it was relying on was not accurate. This type of request is in the nature of discovery (Ill. Rev. Stat. 1971, ch. 110A, par. 216) and as such the trial court has wide discretion in controlling it. Considering when the request was made and

the discretion allowed the court, we hold that it was reasonable to have denied the request.

The final issue we consider is the propriety of certain cross-examination of one of the defendant's witnesses. The Tollway had requested and was granted a motion in limine excluding testimony of earlier offers to purchase defendant's land, on the theory that such offers had been influenced by knowledge of the location of the tollway extension. During trial, defendant made a motion to reconsider the order granting the motion in limine. After the Tollway had rested, on defendant's motion the court ruled that testimony of a prior offer for part of defendant's land by one, Palmeri, would be permitted. On cross-examination of the witness providing this testimony, the court permitted the Tollway's attorney to inquire about Palmeri's knowledge of the proposed location of the tollway; it was also disclosed that Palmeri was well acquainted with State highway officials. We recognize that there was error in allowing this cross-examination. However, since during the course of trial the court, at defendant's request, reversed its earlier ruling, the Tollway contends this inquiry was justified as it was too late to initiate discovery in respect to this particular offer. As this court has previously stated, the question on review is not whether the trial was scrupulously error free, but whether any errors prejudiced the appellant or unduly affected the outcome. (*Department of Transportation v. Janssen* (1975), 34 Ill. App. 3d 244, 339 N.E.2d 359.) It is our view that while there may have been error regarding the cross-examination, we do not believe under the circumstances of this case that defendant was prejudiced or that the outcome of the case was unduly affected.

The decision of the circuit court is accordingly affirmed.

Affirmed.

BOYLE and NASH, JJ., concur.