THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellant, v. SHELL OIL COMPANY *et al.*, Defendants-Appellees.

First District (3rd Division) No. 86—1983

Opinion filed May 27, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Roy E. Frazier, Jr., and Richard A. Redmond, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Righmeimer, Martin, Bridewell & Cinquino, P.C., of Chicago (Leo N. Cinquino and Sandra L. Hebenstreit, of counsel), for appellees.

JUSTICE WHITE delivered the opinion of the court:

The Department of Transportation of the State of Illinois (Department) used its powers of eminent domain to acquire part of a service station owned by Shell Oil Company (Shell). A jury awarded Shell $88,000 as just compensation for the taking. The Department appeals.

The Department sought to add a turning lane at the southeast cor-

ner of the intersection of Sauk Trail Road and Chicago Road in South Chicago Heights. To do so it needed to acquire a triangular piece of land from the Shell service station on that corner. The Department filed its complaint for condemnation in November 1984, and, on February 19, 1985, the court ordered that the title be vested in the Department with just compensation to be determined later. The Department completed its work on the corner in September 1985.

Prior to taking, the Shell service station occupied a rectangular lot of approximately 24,500 square feet. The triangular piece which the Department took from that lot consisted of 741 square feet. Before the taking, the Shell station had almost 190 feet of frontage along Chicago Road and 126 feet of frontage along Sauk Trail Road; after the taking it had 152 feet of frontage along Chicago Road and 88 feet of frontage along Sauk Trail Road. It had four entrances both before and after the taking, but the entrances were approximately 48 feet across before the taking, and 32 feet across after the taking. Prior to the taking the entrances formed 45° angles with the roadway; afterwards the angles were altered to 90°.

At trial the Department presented Charles Southcomb as its principal witness. Southcomb testified that the lot was best used as a service station. In his opinion the value of the property taken was $6,400. The value of the remainder before the taking was $288,600, and after the taking the value would again be $288,600 once the advertising sign and lights were relocated. He estimated that the relocation of the sign and lights would cost about $4,500. In his opinion the access to the property was basically the same after the taking as it had been before the taking.

The Department made a motion *in limine* to exclude testimony relating to the volume of sales at the Shell station. The trial court denied the motion.

Shell presented Lon Gardner, its senior administrative analyst, as its first witness. Gardner testified that in 1983 Shell shipped an average of about 50,000 gallons of gasoline each month to the gas station at issue. In 1984, Shell shipped 55,300 gallons per month, and Shell maintained that average from January 1985 until September 1985. In September 1985, Shell shipped only 33,000 gallons; in October it shipped 25,000 gallons; in November 42,000; in December 50,000; in January 1986 it shipped 34,000 gallons; in February 26,000; and in March 1986, the last month for which figures were available, it shipped 34,600 gallons. Thus, after the taking was completed, Shell shipped an average of only 34,000 gallons per month to the same station to which it had previously shipped an average of 55,300 gallons per month.

Gardner did not testify regarding damages or the value of the property, nor did he attempt to explain the decrease in sales.

Shell next presented real estate broker Arthur Sheridan, who testified that in his opinion the property taken was worth $6,670. He found that access to the remainder was substantially impaired because the driveways were made smaller and cars needed to make sharper turns in order to enter the station. In his opinion the remainder was worth $301,860 before the taking, and after the taking it was worth $213,860, a decrease in value of $88,000. Sheridan relied principally on sales of similarly situated service stations in arriving at his estimates of the value of the remainder. He also took into account the cost of relocating the pumps and the service bays in order to restore access to the property to some extent. The driveways could not be expanded beyond 35 feet in width due to Department regulations. (92 Ill. Adm. Code 550.70 (1985).) On cross-examination, Sheridan admitted that he took the decreased sales into account, but he viewed the decreased sales only as an indication that the taking substantially impaired access to the station. He testified that ease of ingress is of primary importance in determining the value of a service station.

■ On appeal the Department contends that the trial court erred when it denied the Department's motion *in limine* to exclude testimony related to the volume of sales at the station, because the volume of sales is irrelevant to determination of just compensation for the taking. Just compensation for a partial taking consists of (1) the fair market value of the property taken at its best use on the date of filing and (2) the difference between the fair market value of the remainder prior to the taking and its fair market value after the taking and improvement. (*Department of Public Works & Buildings v. Barton* (1939), 371 Ill. 11, 16, 19 N.E.2d 935.) The Department's expert testified that the remainder was best used as a service station. Shell's expert testified, without objection, that ease of ingress is of primary importance for determining the value of a service station. Shell contends that the sales evidence was relevant to the issue of access to the station.

■ Shell operated the station both before and after the taking, selling essentially the same product there after the taking as it sold there before. For three years before the improvement Shell sold, on average, almost 55,000 gallons of gasoline each month at that station; in the six months following the improvement it sold only an average of 34,000 gallons at that location each month. The Department contends that the decrease in sales is irrelevant because the change in sales could have been caused by any of a wide variety of factors unrelated to ease of access. The Department relies primarily on *Jacksonville &*

*Southeastern Ry. Co. v. Walsh* (1883), 106 Ill. 253, and *Forest Preserve District v. Hahn* (1930), 341 Ill. 599, 173 N.E. 763.

In *Jacksonville*, the railway used its power of eminent domain to acquire land on which Walsh ran a saloon. The trial court admitted evidence regarding liquor sales on the property, and the profits on those sales. Our supreme court said:

> "There can be no plainer proposition than the cash value of the property condemned was the sum appellee was entitled to recover as damages. All legitimate evidence tending to establish that sum was proper, and all evidence that tended to enhance the damages above or reduce them below that sum was illegitimate and improper. The inquiry should have been confined to the market value of the property, and all evidence of the amount of business that was or could be done in it, or the probable profits arising therefrom, was improper, and should have been rejected. The purposes for which it was used and designed, its location and advantages as to situation, were proper matters of consideration by the jury; but the profits of the business of the past, and conjectural profits for the future, were too speculative and uncertain upon which to ascertain the market or cash value of the property. \*\*\* [S]ales depend so largely on varying circumstances that the damages are purely speculative. \*\*\* Again, one person can do a greatly larger business in the same calling, at the same place, and under the same circumstances, than another." (*Jacksonville & Southeastern Ry. Co. v. Walsh* (1883), 106 Ill. 253, 255-256.)

The court reversed the judgment of the trial court because the trial court admitted evidence of sales and profits.

*Jacksonville* involved the taking of Walsh's entire property, so the court did not confront an issue of damages to a remainder. None of the factors listed in *Jacksonville* could explain the decreased sales in the case at bar. Here, there is no question as to whether a different owner would receive more or fewer customers than the actual owner—there is only a comparison of Shell's sales before the taking with Shell's sales after the taking. There was no change in law or licensing, and after three years of averaging 55,000 gallons in sales, the change is not likely to be a random variation in sales. In this case Shell's sales appear to be closely related to its "advantages as to situation," including ease of access to the station, which are relevant, under *Jacksonville*, to the determination of the fair market value of the property.

*Hahn* also involved a complete taking, so there was no problem of determining damages to a remainder. Hahn owned a parcel of land on

which he operated a roadhouse. The Forest Preserve District took the land. At the trial to determine just compensation for the land, Hahn presented as a witness a real estate broker who testified that he determined the value of the land "from the business standpoint." (*Forest Preserve District v. Hahn* (1930), 341 Ill. 599, 601, 173 N.E. 763.) He relied on evidence of "the amount of business that the man has been doing. \*\*\* [A]t the rate he was charging for chicken dinners and the amount of people that came in there, the man could double his money in a certain length of time." (341 Ill. 599, 601, 173 N.E. 763.) The court held that this testimony was improperly admitted. (341 Ill. 599, 602-03, 173 N.E. 763.) The court has more recently reiterated the principle in a case which involved a partial taking, *Department of Transportation v. Quincy Coach House, Inc.* (1976), 64 Ill. 2d 350, 356 N.E.2d 13. In that case Quincy Coach House introduced evidence of the value of the land taken based on an "income approach" to valuation. The expert witness projected estimates of the income which could be derived from the land and reduced that sum to present worth. (64 Ill. 2d 350, 354-55, 356 N.E.2d 13.) The court held that this evidence was irrelevant to determination of just compensation. 64 Ill. 2d 350, 359-60, 356 N.E.2d 13.

█ The expert witness for Shell emphasized repeatedly that he did not base his valuation on an income approach or business valuation of the property; he relied strictly on a market approach. He relied on the sales figures solely as substantiation of Shell's claim that access to the station was worsened by the taking. No witness ever converted the gallon sales to dollar sales or to dollar profits; no witness attempted to project profits from the property or use profits as a basis for valuation of the property. We do not believe that the jury, without the guidance of an expert witness, took these steps to determine the value of the property. There is no indication in the record that the jury relied on an income approach to valuation: their verdict is well within the range of the testimony, and the testimony was clearly based on the market approach to property valuation.

We find that the evidence of the decrease in gallons of gasoline pumped at the station was relevant to a determination of the change in accessibility of the station. The evidence was relevant to determination of the value of the property after the taking and was properly admitted. The judgment of the trial court is affirmed.

Affirmed.

RIZZI and FREEMAN, JJ., concur.