# Illinois Official Reports

## Appellate Court

---

**Department of Transportation v. Dalzell, 2018 IL App (2d) 160911**

---

| | |
|---|---|
| Appellate Court Caption | THE DEPARTMENT OF TRANSPORTATION, Plaintiff and Counterdefendant-Appellant, v. DARLENE M. DALZELL, as Trustee Under Declaration of Trust Dated December 12, 1990; RONALD L. DALZELL, as Trustee Under Declaration of Trust Dated December 12, 1990; UNKNOWN OWNERS; and NONRECORD CLAIMANTS, Defendants (Ronald L. Dalzell, as Trustee Under Declaration of Trust Dated December 12, 1990, Defendant and Counterplaintiff-Appellee). |
| District & No. | Second District<br>Docket No. 2-16-0911 |
| Filed | January 31, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-ED-127; the Hon. Dorothy French Mallen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General (Nadine J. Wichern, Assistant Attorney General, of counsel), and Todd L. Lindquist, Special Assistant Attorney General, both of Chicago, for appellant.<br><br>Bryan P. Lynch, of Law Office of Bryan P. Lynch, P.C., of Chicago, for appellees. |

| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Zenoff and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, the Illinois Department of Transportation (IDOT), brought a condemnation action under the Eminent Domain Act (Act) (735 ILCS 30/1-1-1 *et seq.* (West 2008)) and the Illinois Highway Code (605 ILCS 5/4-501 *et seq.* (West 2008)) to acquire property owned by defendants, Darlene M. and Ronald L. Dalzell, as trustees under a declaration of trust dated December 12, 1990.[1] Dalzell filed a counterclaim seeking compensation for damage to the remainder (*i.e.*, the part of his property not taken). After trial, the jury found that the just compensation due to Dalzell totaled $247,000, comprised of (1) $23,000 for the taking of parcel No. 1EA0014, (2) $220,000 for damage to the remainder, and (3) $4000 for damage to the property within and outside of a temporary-easement strip on parcel No. 1EA0014TE. The trial court denied IDOT's motion for a new trial.

¶ 2 IDOT appeals, first raising issues concerning the court's jurisdiction over certain claims for damages. Next, IDOT challenges numerous court rulings concerning the parties' motions *in limine* as well as its decisions to permit or restrict certain testimony, limit cross-examination of a witness, and refuse certain jury instructions. Finally, IDOT asserts that Dalzell's counsel's opening and closing statements constituted plain error. IDOT requests a new trial. For the following reasons, we affirm.

¶ 3 **I. BACKGROUND**

¶ 4 Dalzell owns property on the northeast corner of North Avenue (also known as Route 64) and Powis Road in West Chicago. Since 1985, Dalzell has operated thereon a business, On Site Storage, for public rental of parking areas and storage of steel containers (ranging approximately 20 to 40 feet in length). Drivers could originally access Dalzell's property via two driveways, one off North Avenue, which runs east-west, and the other off Powis Road, which runs north-south.

¶ 5 On December 14, 2010, to complete its public-works project of widening and resurfacing North Avenue, IDOT filed a complaint for condemnation of portions of Dalzell's land. Specifically, IDOT wished to acquire two things:

> 1. Fee-simple title to parcel No. 1EA0014. The parcel is roughly an L-shape, with the short arm near the southwest corner of the property (running parallel to North Avenue). The long arm extends along the west border of the property, on Powis Road. The area connecting the short arm to the long arm encompasses a triangular section of

---

[1]Darlene passed away during the pendency of the litigation, and Ronald was substituted as the successor trustee of her trust. Accordingly, we refer to Dalzell, in the singular, in this opinion. In addition, we note that, on February 12, 2012, a default judgment was entered against any unknown owners and nonrecord claimants.

grass lawn. Included *within* the parcel taken, on the west border (or long arm), is a portion of the property's Powis Road driveway.

2. A temporary easement (for a period up to five years) on parcel No. 1EA0014TE. This easement is located directly east of the long arm of parcel No. 1EA0014, although it is shorter, and it includes a section of, and spans the width of, the Powis Road driveway.

¶ 6 Although slightly out of sequence chronologically, we note two additional aspects of the overall project to provide context for the issues and arguments. First, the project's expansion of North Avenue elevated the stretch of highway directly in front of the property's North Avenue driveway, and IDOT placed a concrete barrier there that closed that driveway. Second, a concrete median was ultimately placed in the middle of Powis Road such that the property's Powis Road driveway became only a right-turn-in, right-turn-out access point. Collectively, the closure of the North Avenue driveway and the median barrier on Powis Road prevent drivers from exiting the property onto North Avenue; rather, drivers must exit onto Powis Road and drive 3.5 miles to return to North Avenue.

¶ 7                                    A. Quick-Take Hearing

¶ 8 Shortly after filing its complaint, in January 2011, IDOT moved for immediate possession and use of the two parcels, *i.e.*, a "quick-take" motion under section 25-7-103.1 of the Act (735 ILCS 30/25-7-103.1 (West 2010)), alleging that delay in acquiring the two parcels would set back the North Avenue improvement project. In response, Dalzell filed a "traverse and motion to dismiss," arguing, in part, that IDOT did not have the requisite authority to acquire the property, the taking was not necessary, and the taking exceeded IDOT's needs. An October 12, 2011, order reflects, however, that, "in consideration of the parties' agreement and the modification of the construction plans for Route 64, [Dalzell] withdraw[s] [his] Traverse and Motion to Dismiss." Thereafter, on November 4, 2011, the parties entered into a stipulation that acknowledged both IDOT's eminent-domain authority and the existence of reasonable necessity to take the property through "quick-take" proceedings. However, the parties agreed that their stipulation regarding the value of the two parcels would be "irrelevant to, separate from, independent of, and shall have no effect on, the issue of damages to the remainder due to the take."

¶ 9 Therefore, at the quick-take hearing, testimony was received concerning the value of the remainder. Various appraisers testified, and notably, all acknowledged that the project would result in the closure of the North Avenue driveway. IDOT's appraiser, Frances Lorenz, did not believe that the North Avenue driveway added value to the property and, thus, did not assess any reduction in value to the property from the driveway's closure. Lorenz explained:

"Q. You didn't give any compensation for the North Avenue driveway; correct?

A. That's correct.

Q. And why did you make reference to it in your report if you weren't giving any compensation to Mr. Dalzell?

A. I didn't think it was appropriate to ignore it. *It was a part of the taking, part of the improvement*, and I thought that it was important to disclose in my report what's going on." (Emphasis added.)

Dalzell's appraiser, Michael MaRous, did attribute the loss of the North Avenue driveway as an element of damages. He explained that the property would go from "two main driveways to one driveway that's far inferior." MaRous testified that, in the "before" state, both driveways were "absolutely" important to the property and that losing one driveway would be a material change to the site. MaRous testified that he knew of no appraisal practice that would ignore the closing of a driveway in a condemnation project. He explained that it is customary for any appraisal report to include the number of driveways or access points to the subject property. When asked why, in an appraisal concerning condemnation powers, he considers damages associated with closing a driveway, MaRous explained, "[b]ecause a driveway for most properties is a very important fact. It's kind of like the main artery into a property, and it's very critical and properties that have limited access generally have a direct reflection of a lower value."

¶ 10 A few years later, on July 28, 2014, the parties entered into a three-part stipulation. First, they agreed that, as of the date of valuation in this case (*i.e.*, December 14, 2010, when IDOT filed its condemnation complaint), the property had a right of access directly onto North Avenue. Second, they agreed that, as of the date of valuation, the "North Avenue driveway existed from North Avenue directly north to the subject property." Third, and most relevant, they agreed that "[b]oth parties *may* present evidence at trial as to the subject property's North Avenue driveway's *value* based upon *any issue of fact* except as to the legality or illegality of the driveway." (Emphases added.)

¶ 11 On December 3, 2014, Dalzell filed his counterclaim for damage to the remainder. The counterclaim noted that "the Remainder parcel is owned and used in common with the Part Taken and Easement Area" that IDOT acquired. It did not mention or specifically request damages for the closure of the North Avenue driveway.

¶ 12 B. IDOT's Motion *In Limine* No. 1: North Avenue Driveway

¶ 13 On March 4, 2016 (more than five years after the condemnation complaint was filed), IDOT filed numerous motions *in limine*, with motion No. 1 requesting that Dalzell's appraisers be barred from considering the closure of the North Avenue driveway as an element of damage to the remainder. IDOT argued that such testimony would be improper because the closure was not a direct and proximate result of the taking and, therefore, any claim for damages based on that closure must be brought in the Illinois Court of Claims, which has exclusive jurisdiction over all claims against the State for damages in any case sounding in tort, if such a case would lie against a private person in a civil suit. 705 ILCS 505/8(d) (West 2008). IDOT noted that the taking itself did not physically touch the North Avenue driveway and that the property's North Avenue access was instead altered by the overall construction project. IDOT argued that, "in order to claim damage to the remainder here as a result of the closure of the North Avenue access point in this circuit court action, the damage must be a direct and proximate result of the taking of parcel Nos. 1EA0014 and 1EA0014TE and not merely as a result of [IDOT's] total construction plan and construction of North Avenue or of construction in [the] general area." In sum, IDOT argued that the trial court lacked jurisdiction over damages claims concerning the North Avenue driveway, and it therefore asked that Dalzell's appraisers be barred from considering the closure of the driveway in formulating their damage-to-the-remainder opinions.

¶ 14    On March 18, 2016, after hearing oral argument, the court denied the motion. Noting that the constitution provides that private property may not be taken or damaged for public use without just compensation, the court framed the issue as follows: whether, when arriving at an opinion of the fair market value of the property after the taking occurred, an appraiser could consider the closure of access, even though the taking did not physically touch the closure and the closure resulted from the construction project. The court agreed with IDOT that, if the taking had *nothing* to do with the closure of the North Avenue driveway, any claims for damages concerning the closure would be exclusive to the court of claims:

> "But I think that the closing of the North Avenue driveway in this case does impact the value of the property, *in light of the change in the access at Powis Road, which was the taking*. So I agree with [Dalzell's counsel] that this is interrelated, and the decrease in value in the after is directly related to the taking.
>
> And you—I don't see how you can take out the closure of the North Avenue driveway, because if the North Avenue access point was still open, then the right-in/right-out of Powis Road wouldn't matter. It wouldn't decrease the value of the property at all, because you can get in and out North Avenue.
>
> But you can't get in and out at North Avenue, and so the appraisers, I think, have to consider the impact of the taking as a whole, which would include the closing of North Avenue to arrive at a fair market value in the after.
>
> *** [T]he fair market value of this property in the after[,] in order to arrive at the figure[,] you cannot ignore the closing of the North Avenue access. It has to be part of the consideration. *** *[I]t's directly related to the taking and the change in the access at Powis Road*." (Emphases added.)

¶ 15    In response to questions from IDOT, the court explained that Dalzell could *not* request damages as a result of the closure of the North Avenue driveway. Rather, Dalzell could request that the jury consider the difference between the property's value before and after the taking, and part of that difference might be based on the driveway's closure. IDOT asked whether the jury would receive an instruction that it could not award damages for the closure, and the court responded that it was not going to instruct the jury on all things for which it could *not* award damages. Rather, the jury would be told what it *could* consider and that it would be tasked with awarding the difference between the fair market value before and after the taking. Further, the court reiterated that the appraisers would not be permitted to testify as to damages in a specific amount attributable to the closure but, instead, as to:

> "[T]heir opinion based on a reasonable degree of appraisal certainty that the before market value is X and the subsequent fair market value is Y. And then I base my opinion on these comparables, and I base my opinion on this situation and that situation, one of which is going to be the fact that you can only go right in and right out of the Powis driveway, which really wouldn't have had much of an impact if they still had this North Avenue entrance.
>
> But since they don't have the North Avenue entrance anymore, this has been a huge impact to the value of the property. There will be no amount assigned as damages for the closure of North Avenue."

¶ 16    The court summarized its ruling:

"I actually agree with both of your positions, and I agree with [IDOT] that if they're seeking damages for the closure of access to North Avenue they've got to go to the Court of Claims. If they're seeking the fair compensation between the value of the property before and the value of the property in the after *** I just don't see how an appraiser cannot include a factor that actually exists. I don't know how they do that, and that's why I say it's interrelated. And the fair market value in the after is directly a result of the taking, and that's why it can be considered by [the] appraisers."

¶ 17    IDOT moved for reconsideration. IDOT first purported to provide a comprehensive review of eminent-domain precedent establishing that claims of impaired access belong in the court of claims and that, therefore, Dalzell could not seek damages in the trial court for the closure of the North Avenue driveway, which was not part of the taking. As to the court's concern about how the appraisers could value the property after the taking without considering the closure, IDOT asserted, for the first time, that the appraisers must value the property after the taking as though the driveway remained *open*. Specifically, IDOT noted that the driveway was not physically closed until January 20, 2012. Therefore, on December 14, 2010, the date of valuation, the driveway remained open. Accordingly, IDOT argued, the "solution to the court's concern becomes clear: the appraisers in this circuit court proceeding must consider that the North Avenue [d]riveway existed and provided access to North Avenue in the before and after conditions, but exclude any damages for the closure of the North Avenue [d]riveway." IDOT urged that such an approach would not force the appraisers to consider a hypothetical, because, in fact, the North Avenue driveway was open on December 14, 2010, and that circumstance did not change as a result of the taking. Rather, the driveway did not close until months later.

¶ 18    In denying the motion, the court first questioned the strength of IDOT's argument in light of the fact that it was being raised on the eve of trial when, if the law were as clear as IDOT propounded, it would have been raised at or near the time of the quick-take hearing and before significant taxpayer expenditures were incurred for discovery and numerous other motions concerning the North Avenue driveway. The court reiterated that damages arising from closing the North Avenue driveway would, if sought on their own, be properly sought only in the court of claims. However, the court noted that its jurisdiction of Dalzell's claim was supported by Illinois Pattern Jury Instructions, Civil, No. 300.49 (2011) (hereinafter IPI Civil (2011) No. 300.49), which provides that, in determining the fair market value of the remainder after a taking, the jury may consider *any detriment* (or benefit) from the proposed public use proved by the evidence that decreases (or increases) the fair market value of the remainder. The court did not find that instruction to be qualified, and it opined that, if the driveway's closure had somehow benefited the property, IDOT likely would have used that benefit to argue for a reduction in damage to the remainder. Thus, the court noted, "I don't see how the government can use that benefit and not let the property owner use a detriment." The court stated that the driveway's closure would be presented to the jury not as evidence of specific damages for cutting off the access but, rather, under IPI Civil (2011) No. 300.49.

¶ 19    The court next acknowledged that parties could not confer or waive subject-matter jurisdiction and, so, the issue could be raised at any time. However, the court noted that, if the issue were *not* jurisdictional, it would have found estoppel and waiver based on IDOT's position at the quick-take hearing and throughout the litigation, as well as on its delay in

raising the issue and the resultant expense and time that went into arguments concerning the driveway.

¶ 20     Finally, as to IDOT's argument concerning the date of valuation:

"IDOT, really, is asking me to consider *** that the property is supposed to be valued as of the—a date that the eminent domain complaint was filed, which is absolutely true, that's the part taken and the easement taken. But it cannot be the law that you cannot consider the benefit or detriment of the *proposed public use* because why would we indeed have this IPI instruction if that were true.

So[,] I don't think you can consider when the project was completed to the extent that it closed off the North Avenue driveway and say, you don't get damages to [the] remainder because we didn't complete this project until after the valuation date. And that's essentially what IDOT is arguing, and I don't think that that is correct law." (Emphasis added.)

¶ 21                              C. Safety of North Avenue Driveway

¶ 22     In response to various motions *in limine* filed by Dalzell and as a discovery sanction, the court barred IDOT's engineer and safety expert, Michael Ziegler, from testifying to any opinions concerning the safety of the North Avenue driveway that relied on design speed. In keeping with that ruling, the court also ruled that certain exhibits relating to design speed would not be permitted into evidence and that IDOT could not cross-examine Dalzell's engineer and safety expert, Todd Abrams, concerning design speed. The court ruled, however, that the experts *could* testify to the safety of the driveway on bases not related to design speed.[2]

¶ 23     In a series of discovery requests between 2011 and 2013, Dalzell sought from IDOT any and all prior construction plans since 1995 for North Avenue or Powis Road that included the subject property. It is apparently undisputed that (1) there was only one prior project at this intersection, in 1995, and (2) the design speed for the North Avenue driveway would have been included within any such plan, even appearing on the cover sheet. It is also apparently undisputed that IDOT objected to the requests as burdensome and irrelevant and that, at one point, IDOT suggested that any such documents had been destroyed, providing to Dalzell its document-retention policy.

¶ 24     Ziegler issued reports in April and May 2013 and November 2014, opining that, for multiple reasons, in the "before" condition and on the date of valuation, the North Avenue driveway was unsafe, based in part on tests and equations applying a design speed of 50 miles per hour. In December 2014, Dalzell moved for leave to issue discovery *specifically* to obtain documents related to design speed. IDOT objected on the basis of untimeliness because discovery had already closed. On December 18, 2014, the court denied Dalzell's motion, noting that anything not produced would not be introduced at trial by either side. However, the court extended, until August 2015, the time to disclose nonappraisal expert reports.

¶ 25     Abrams issued a report in January 2015, opining that the North Avenue driveway was safe, applying a design speed of 45 miles per hour. His deposition was taken on February 17, 2015.

_____

[2]We note that the parties' stipulation (*supra* ¶ 10) allowed for consideration of the issue of the driveway's value. The driveway's safety related to its value as an access point on the date of valuation. In turn, its value, or lack thereof, was relevant to the extent to which its closure impacted damage to the remainder.

¶ 26    On March 12, 2015, IDOT produced to Dalzell a rebuttal opinion from Ziegler (attaching, according to Dalzell, more than 1000 pages of documents), critiquing Abrams's opinion, in part for relying on an incorrect design speed. Included within the attachments were documents showing that the design speed before the taking was 50 miles per hour (consistent with Ziegler's opinion). In March 2016, Dalzell moved *in limine* to bar Ziegler's testimony based on design speed, as the documents supporting that opinion were not previously disclosed.

¶ 27    In response to Dalzell's motion, IDOT argued that Ziegler did not have the documents at issue until he prepared his report rebutting Abrams's opinion. However, the court found that Dalzell's general discovery requests, to which IDOT objected, would have encompassed documents that would have reflected the design speed. Moreover, the court found critical that, in December 2014, IDOT objected to Dalzell's specific request for design-speed documents when it knew that Ziegler had testified to safety based on design speed, even if he had not used the documents at issue. Accordingly, although IDOT produced the documents in March 2015, the production was not until after Abrams rendered an opinion and was deposed. IDOT was then able to give Ziegler the documents to bolster his opinion and to critique Abrams's opinion as based on incorrect information.

¶ 28    IDOT argued that, although Dalzell did not receive the documents until March 2015, he had until August 2015 to have Abrams amend his opinion but he did not do so; therefore, IDOT argued, Dalzell's motion *in limine* simply reflected gamesmanship. The trial court disagreed. It granted Dalzell's request to bar Ziegler from testifying to any opinion based upon the design speed before the taking, but it held that he could testify to his opinion to the extent that it was not based on design speed. The court similarly held that no other witnesses could rely on design speed or Ziegler's analysis or conclusion relating to design speed. The court noted, apparently referencing Dalzell's initial discovery requests for construction plans (which would have included design speed), that the spirit of discovery is full disclosure and that "if anything could remotely be within a notice to produce or an interrogatory, then it should be produced, especially when you have the government on one side and a private party on the other side." Further, with respect to Dalzell's specific request for design-speed information, the court concluded:

        "To object to [the request] on that basis that it's too late, discovery is closed[,] is kind of like, in your face my expert is using this, but I'm not going to let you use it because you were too late. I think [it] is outrageous, really.

        To object to it, knowing your expert is going to be using the exact documents that they have been requesting all along and now come into court and try to denigrate Mr. [Abrams's] testimony because he didn't have the documents because you didn't produce them and then allow the expert to render an opinion based upon documents that you objected to producing, I think is outrageous."

¶ 29    The court denied IDOT's motion to reconsider the ruling. IDOT asserted that the initial requests did not specify design-speed information and that it did not realize that design speed was an issue until after Abrams's deposition. Therefore, when it objected to the request in December 2014, IDOT thought that the request was seeking to challenge what the design speed should be, not just to find out what it was. IDOT reiterated that Dalzell had time to have Abrams amend his opinion after the documents were produced. In response, Dalzell noted that none of IDOT's arguments were proper for a motion to reconsider. Further, he argued that, although they did not specifically mention design speed, his early discovery requests would

have encompassed it and, clearly, IDOT's objections that production was burdensome and irrelevant and that the documents had been destroyed proved untrue. In fact, the evidence reflected that IDOT's counsel never requested the documents until February 20, 2015. In any event, Dalzell noted, he did not need to justify to IDOT his strategic purpose for wanting the documents, so its failure to produce the documents until it realized *why* he wanted them was inexcusable.

¶ 30    The trial court agreed with Dalzell. It again emphasized that the initial discovery requests would have included the design-speed information. Nevertheless, it explained, it was more concerned with IDOT's objection to Dalzell's December 2014 specific request for design-speed information. Even if Ziegler did not rely on the documents at issue for his *initial* opinions, he nevertheless, even then, opined on design speed. Dalzell wanted documents that related to that issue, upon which Abrams would also be expected to opine. IDOT objected to the request, and the court denied it:

> "And then, I'm sorry, [IDOT] had the audacity to then produce it to their expert, and it just happened to confirm his opinion that the design speed was 50 miles per hour.
>
> I mean, what would happen if the design speed was something else?
>
> It was just lucky that it happened to confirm it.
>
> But here is the prejudice to [the] property owner. He already disclosed his expert. He already had his expert's report disclosed. He already had presented his expert for deposition testimony. At which time the expert, Mr. Abrams, is utilizing an, apparently, incorrect design speed. So that all of his testimony with regard to the safety of this driveway now becomes imperil[ed].
>
> ***
>
> *** [W]e are not producing it to the defendant. Yet, we are going to have our own expert—have it produced for our own expert, and [it is] going to confirm his opinion that this was indeed the 50-mile-an-hour design speed."

¶ 31    The court denied the motion to reconsider, reiterating that, as a sanction pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002), it was barring Ziegler from testifying to any opinion based on the design speed, for IDOT's (1) failure to produce the prior construction plans in response to Dalzell's production requests and (2) objection to Dalzell's specific request for design-speed information. The court noted that other witnesses would also be prohibited from testifying, to the extent that their opinions relied upon Ziegler's design-speed analysis. Further, not even Abrams could testify to design speed because his testimony that the design speed was 45 miles per hour would open the door to IDOT's cross-examination of him for using an incorrect design speed, an error resulting from IDOT's failure to produce relevant information. "So anything that is based on the design speed is out of the case on both sides."

¶ 32                                     D. Dalzell's Motion *In Limine* No. 14

¶ 33    As previously noted, the parties stipulated that the legality of the North Avenue driveway's existence before the taking would not be an issue at trial. However, Dalzell believed that IDOT still wished to touch upon that issue through evidence concerning the existence, or lack thereof, of a permit for the driveway. As such, Dalzell deposed Thomas Gallenbach, IDOT's permit engineer.

¶ 34        At some point prior to trial, the trial court apparently agreed that no evidence would be received concerning the driveway's permits. Therefore, Dalzell moved *in limine* to exclude Gallenbach's testimony, partly on the basis that IDOT, after Gallenbach's deposition, amended its disclosures for *other* expert witnesses, who had already opined and been deposed, as including "all matters disclosed and discussed" in Gallenbach's deposition. Dalzell objected that IDOT's other experts' opinions could not possibly have been based on something that did not exist, *i.e.*, Gallenbach's testimony, when they rendered their conclusions.

¶ 35        The court granted the motion in part. It did not bar all evidence from Gallenbach. However, it agreed that IDOT should not be permitted to effectively supplement other witnesses' opinions with Gallenbach's testimony. The court noted that the other witnesses did not need or have Gallenbach's testimony when they issued their opinions. For them to now testify that they reviewed Gallenbach's testimony and that it supported their opinions would unfairly buttress their testimony. The court therefore barred five of IDOT's witnesses from discussing Gallenbach's testimony. However, it also held that, on cross-examination of those witnesses, Dalzell could not assert or imply that they had failed to review Gallenbach's testimony. The court stated that, with respect to the other witnesses, "[Gallenbach's testimony is] not going to be mentioned in their testimony at all."

¶ 36        At trial, IDOT made an offer of proof concerning Gallenbach's testimony, specifically with respect to Dalzell's objection to his testimony concerning motorists "coming over the crest of the bridge." IDOT offered Gallenbach's entire deposition transcript. It apparently did not, however, make an offer of proof as to what other witnesses would have testified with respect to Gallenbach's opinion.

¶ 37                        E. Motions and Instructions Regarding Barrier Median

¶ 38        As previously noted, before the taking and the project, the property had direct access to North Avenue from the North Avenue driveway and indirect access to North Avenue by exiting left out of the Powis Road driveway. After the taking and during the project, direct access to North Avenue was removed when the North Avenue driveway was closed. The indirect access was not retained either, as IDOT installed a barrier median along Powis Road that prevents drivers from turning left either (1) onto Powis Road from the property to access North Avenue at the intersection or (2) off Powis Road to access the property. Therefore, although North Avenue is less than 100 feet from the Powis Road driveway, drivers can access it from the property only by turning right out of the Powis Road driveway and then proceeding in a 3.5-mile circular route. Further, the sole means of accessing the property is a right turn onto Powis Road from North Avenue and then a right turn onto the Powis Road driveway. Also, the Powis Road driveway was reduced in size by the taking.

¶ 39        Prior to trial, IDOT moved *in limine* to bar any damages flowing from the barrier median, on the basis that damages from a barrier median are not compensable. IDOT also moved *in limine* for a finding as a matter of law that there was no material impairment of access to the property (and Dalzell filed a motion *in limine* arguing the opposite position). IDOT submitted proposed jury instructions on the same bases. In sum, IDOT argued that not every limitation of access is compensable and that, because the installation of barrier medians is a valid exercise of a government's police powers and Dalzell retained direct access to Powis Road's lane of traffic that abuts the property, he was not entitled to compensation flowing from the median or the resulting 3.5-mile route.

¶ 40        After hearing oral argument, the trial court distinguished the cases upon which IDOT relied, namely *Department of Public Works & Buildings v. Wilson & Co.*, 62 Ill. 2d 131 (1975), and *Department of Public Works & Buildings v. Mabee*, 22 Ill. 2d 202 (1961), and denied IDOT's motions *in limine* (thereby also granting Dalzell's motion concerning material impairment of access). The court found that there existed both a taking and a material impairment of access to the property at the Powis Road driveway. "It's not just because a barrier has been put there, it's also because of the physical taking and the necessity of now having to drive further to try and get back to the point they could go back in the before." As it found sufficient evidence to allow the jury to consider material impairment of access, the court determined that it was for the jury to decide whether there were any damages flowing from that impairment.

¶ 41        At the jury-instruction conference, the court rejected, without prejudice, a non-IPI instruction that IDOT offered, allegedly based on *Department of Public Works & Buildings v. Greenwell*, 45 Ill. App. 3d 159, 163 (1977), to prevent the jury from awarding damages based upon the 3.5-mile route. The proposed instruction stated, "The law does not permit an award of damages for circuity of travel." The court found, based on its rulings *in limine*, that the trial would focus not on circuity of travel so much as material impairment of access. If, at trial, the evidence did not show material impairment, or if circuity of travel "leaked" into the case, then IDOT could reintroduce the instruction.

¶ 42        At trial, the court also rejected IDOT's presentation of IPI Civil (2011) No. 300.51. That instruction provides, "The law does not permit an award of damages for the *loss or reduction of traffic* which may result from [the installation of a median or divider strip] [the establishment of a one-way traffic regulation], and you should not consider this factor in determining damages to the remainder." (Emphasis added.) *Id.* Further, the comment to the instruction states: "Diminution of traffic must, of course, be distinguished from deprivation of material impairment of access, which is compensable." IPI Civil (2011) No. 300.51, Comment, at 589. As such, the court found that the instruction was meant to ensure that the jury did not compensate for any reduction in traffic flow, which was not an argument raised or an issue upon which evidence was received at trial. Further, it reiterated that diminution of traffic resulting from a barrier median must be distinguished from material impairment of access resulting from a barrier median, the latter being compensable. The court explained that there was evidence, separate from the barrier, that there had been material impairment of access because the Powis Road driveway had been reduced in size by the taking, resulting in a shorter turning radius. However, there had been no evidence regarding traffic flow, and therefore, the court found, the instruction would be confusing to the jury.

¶ 43        At trial, IDOT also moved to strike all testimony about the 3.5-mile route, arguing again that the barrier median was the sole cause of the 3.5-mile route. Dalzell argued that the 3.5-mile route concerned impairment of access, both ingress and egress. "And that is the essence of material impairment of access. If you only had to go 20 extra yards, you'd never [have] had material impairment of access. This is probably the textbook case on material impairment of access." The court agreed, and it denied the motion to strike.

¶ 44                                F. Opening and Closing Statements

¶ 45        During opening statements, Dalzell's counsel informed the jury that the issues in the case included "access, responsibility and accountability." He explained that the jurors should view

- 11 -

the evidence through the "prism" of responsibility and accountability. Counsel explained that the case did not concern Dalzell's actions; rather, it concerned IDOT's responsibility to pay just compensation for the ruined access for which it was accountable. Counsel noted that IDOT claimed that the North Avenue driveway was not safe before the taking and therefore lacked value and that its closure thus did not warrant compensation.

¶ 46    Similarly, in closing arguments, Dalzell's counsel explained that the evidence showed that access to the property had been compromised and damaged as a result of IDOT's project and the taking, responsibility for which lay with IDOT, not Dalzell, who had done nothing wrong. "He only happens to be the property owner, and that's where the accountability comes in. IDOT has to be held accountable." Counsel requested that the jury, recognizing IDOT's responsibility, compensate Dalzell fairly and according to the law for the impaired access and the damage to his property. Counsel also noted that "[t]his is the only opportunity that Mr. Dalzell has to be made whole in this process, is through you, as a jury deliberating on the evidence that's been presented." Finally, counsel commented, "If you're not paid just compensation, you violate the Fifth Amendment constitutional right to receive just compensation, and that's why you have to consider the take and the project, because if you don't, you are not properly awarding Mr. Dalzell the just compensation, what's fair, the just compensation that he is due."

¶ 47    IDOT concedes that it did not object at trial to Dalzell's counsel's opening and closing statements.

¶ 48                        G. Dale Kleszynski's Valuation Testimony

¶ 49    One of Dalzell's appraisers, Dale Kleszynski, testified that, to arrive at the value for the part taken, consideration of the whole property was required; "you consider its contributory value *** what does the part that is being taken contribute to the overall value of the real estate." Further:

> "COUNSEL: Okay. And you don't just value the part taken as just this independent, irregular-shaped taking of the property and say what is this part; you look at the value of this in relation to the whole, correct?
>
> KLESZYNSKI: That is correct, what does it contribute to the whole property, as well as the improvements that are on the property."

¶ 50    Kleszynski discussed comparable properties and determined that the unit value for the subject property would fall between $4.71 and $11.35 per square foot. In Kleszynski's opinion, after various adjustments, the value of the property as a whole, before the taking, was $6.75 per square foot. As to the value of the part taken, Kleszynski explained that it equated to $12 per square foot because the contributory value of that portion of the property, as it related to the whole property, was higher than other portions of the site. He stated, "the value of the part taken as part of the whole is an analysis of what the contributory value of the part taken is as it relates to the whole property taking into consideration the utility that is has, as well as the remainder parcel and the improvements that are on it." Counsel asked Kleszynski why he had concluded that the part taken had a substantially higher value than the property overall, and Kleszynski commented, "[i]t's the best part of the site," explaining:

> "[i]t's the most visible portion of the site that is located on North Avenue and Powis Road. And if you were to compare it to some of the back portions of the property, the

contributory value of that portion of the site would be higher when compared to just, by way of example, the back, the furthest eastern section of the property that is in the middle of the site."

He further explained that, from an appraisal perspective, every piece of property has zones of value but not every portion contributes equally; for example, the back corner of a backyard is typically worth less than the front yard. After elements of damage were considered, Kleszynski valued the remainder (after the taking) at $4.60 per square foot.

¶ 51    IDOT did not object to the foregoing direct testimony. On cross-examination, IDOT asked Kleszynski whether, in valuing the part taken, he had considered the contributory value of the improvements contained in the remainder. He replied, "yes."

¶ 52    At the conclusion of Kleszynski's testimony, the trial court offered the jury the opportunity to submit questions for Kleszynski. The jury returned three questions, including: "Regarding the part taken, are you saying that a market purchaser would pay $12.00 per square foot for that part alone? Or would a buyer have to include the balance of the property in a purchase to validate the $12.00 [per] square foot for that parcel?" In response, Kleszynski explained:

"KLESZYNSKI: What I am saying is that the $12.00 [per] square foot is reflective of the high profile nature of that portion of the property.

So, in other words, if for example, and I am just using this as an example, if Mr. Dalzell had somebody who came to him and said I want to put a sign at this location because it's high—

IDOT: Objection, there was no [Rule] 213(f) [disclosure] on sign.

THE COURT: Okay. The signage is not an issue in this case. This is a hypothetical to explain it. So the objection is overruled. You may proceed.

KLESZYNSKI: And I am just using it. It's best explained by example.

So if, for example, somebody came to Mr. Dalzell and said I want to buy this portion of the property because I want to put a sign up on it *** Mr. Dalzell would be—it would be in his best interest to charge them the $12.00 [per] square foot for that property because it would be reflective of the high profile needs that that particular user would have.

What I am saying in this particular instance is that the area that was marked [on an exhibit] in blue on the part taken is, in fact, the highest visibility and the location of the highest profile of the subject property, and so it has a higher *contributory value*.

By contrast[,] if it were true that we were talking about the taking being at the back portion of the property near the rail tracks and it had very little visibility, that number would be significantly lower." (Emphasis added.)

¶ 53    Dalzell's counsel asked some follow-up questions, eliciting that evaluating a narrow strip of land in isolation, with no consideration of its relation to the remaining land, would actually lower the strip's value. As such, counsel confirmed with Kleszynski that "you have to take into consideration the entire property because it's *** an integrated piece of property, correct?" Kleszynski replied, "That is exactly correct. That is why the question is asked what is the value of the part taken as part of the whole. It has to be always considered as part of the whole property in the utility that it carries itself, as well as the utility that it adds to the overall piece of real estate including the improvements in the after condition."

¶ 54 Outside of the jury's presence, IDOT moved to strike Kleszynski's entire testimony. It argued that the jury's question reflected that it was confused "as to what the value of a part taken is." IDOT argued that Kleszynski had discussed the value of the part taken for putting up a sign, versus how that portion contributes to the actual storage use of this property. "They are looking at it now for a sign, and that is highly prejudicial and confusing to the jury. I think that the jury is absolutely confused at that now." Dalzell disagreed, noting that Kleszynski made very clear that he was posing only a hypothetical.

¶ 55 The court overruled the motion to strike the testimony. Noting first that "this jury is, amazingly, on track, which is very gratifying," the court found further that "he clarified it at the end that it has to be part of *the whole part*." (Emphasis added.)

¶ 56                                    H. Dalzell Cross-Examination

¶ 57 Dalzell testified at trial that ingress to and egress from his property are now problematic. He testified that he continues to use the property as an outside storage yard, as he did prior to the taking. However, prior to the taking, 20-foot, 40-foot, and 45-foot trailers could come onto the property. Now, 45-foot trailers cannot get onto the property. A 40-foot trailer can access the property from the Powis Road driveway, but only "with difficulty" so "we don't do it anymore." When asked whether he is conducting essentially the same storage business, Dalzell replied, "It's the same storage business, not the same equipment." IDOT's counsel then asked, "Now was your income from 2010 and 2014 pretty much the same?" The trial court sustained Dalzell's counsel's objection to the question as irrelevant.

¶ 58 IDOT requested a sidebar. There, IDOT presented *Department of Transportation v. Shell Oil Co.*, 156 Ill. App. 3d 304 (1987), as supporting its position that it could use a lack of decrease in income to show that access had not been impaired. Dalzell's counsel noted that impairment of access to a gas station concerned flow of traffic and sales, different concepts from those at issue here, where the changes have impacted what vehicles can physically get in and out of the property. The trial court ultimately disagreed with IDOT, noting that, in *Shell Oil*, Shell's expert testified that sales evidence was relevant to the issue of station access. In contrast, here, there had been "no discovery with regard to income before and income after. You've got no expert to testify to the income before and income after and how that might [a]ffect their valuation."

¶ 59 The court concluded:

"I'm going to sustain the objection. The reason I'm sustaining the objection is because I think that it has very little probative [value] and [is] highly prejudicial in that you're trying to directly relate income to access to this property, and income can be dependent on a lot of things, especially when we're going from 2010 to, I don't even know what year. Are we doing 2016? I don't know when the project was finished? Are we doing it from the time the project was finished to 2016? And since there was no discovery on this, there's been no opportunity to explain why there's *** less of an income. He's 73 years old now. Maybe he's not working as much now. [We are] [t]alking about *the market value of the property itself. Not his income that he generates from that property*. So for those reasons[,] I'm sustaining the objection." (Emphasis added.)

¶ 60                                    I. Abrams's Remedy Plan

¶ 61       At trial, Abrams testified to a remedy plan for the Powis Road driveway, which would allow Dalzell to provide ingress and egress for trucks. Abrams testified that, in order to implement the remedy plan, Dalzell would have to get permission from his neighbor. IDOT objected that the testimony had not been disclosed and violated Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). Dalzell's counsel showed that the evidence was in Abrams's exhibit, "as it relates to where the scope of the remedy plan is and the property lines." Counsel asserted, "It's a fact. It's not an opinion." The court agreed and overruled IDOT's objection. Thereafter, counsel asked Abrams if "Mr. Dalzell would have to go to his neighbor and obtain permission to have an easement or some sort of use of his property in order to construct his driveway?" Abrams responded, "It's an agreement usually between the parties [(*i.e.*, Dalzell and his neighbor)]."

¶ 62       IDOT appeals.

¶ 63                                          II. ANALYSIS
¶ 64               A. IDOT's Motion *In Limine* No. 1: North Avenue Driveway and Jurisdiction
¶ 65       IDOT argues first that the court erred as a matter of law when it denied IDOT's motion *in limine* No. 1 wherein it sought to exclude, on the basis of the trial court's lack of jurisdiction, testimony concerning damage to the remainder caused by the closure of the North Avenue driveway. Reiterating that it took only the two parcels and that the North Avenue driveway was not closed as a result of the taking, IDOT argues that, as a matter of law, any claims of damages to the remainder due to the closure of the North Avenue driveway are within the exclusive jurisdiction of the court of claims. IDOT notes that, to be recoverable in eminent-domain proceedings, all claimed damages must be the direct and proximate result of the *taking*. Therefore, IDOT argues, Dalzell cannot in this action claim damages as a result of the North Avenue driveway closure, where the damages were not a direct and proximate result of the taking, the obstruction to the driveway was not built upon land taken, and the closure resulted merely from IDOT's overall construction plan for North Avenue.

¶ 66       Generally, a court's ruling on a motion *in limine* is reviewed for an abuse of discretion. *City of Quincy v. Diamond Construction Co.*, 327 Ill. App. 3d 338, 342-43 (2002). However, to the extent that this issue presents a question of law, we review it *de novo*, while the court's findings of fact are reviewed under the manifest-weight-of-the-evidence standard. See, *e.g.*, *Illinois State Toll Highway Authority v. South Barrington Office Center*, 2016 IL App (1st) 150960, ¶¶ 31-33. Here, IDOT used its power of eminent domain to take certain property from Dalzell. Dalzell filed a counterclaim for compensation for damage to the remainder. IDOT disputed damages in the amount claimed. Accordingly, the jury here was tasked with deciding (1) the amount of just compensation IDOT must pay Dalzell for the property taken and (2) the amount that would reasonably and fairly compensate Dalzell for any damage to the remainder. See, *e.g.*, IPI Civil (2011) No. 300.12. The issue presently before us implicates the second question, *i.e.*, the evidence that the jury could consider in determining the amount that reasonably compensates Dalzell for damage to the remainder.

¶ 67       A circuit court claim for just compensation derives from the Illinois Constitution. Specifically, article I, section 15, of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I,

§ 15. This constitutional provision is codified in section 10-5-5 of the Act. 735 ILCS 30/10-5-5 (West 2008). Accordingly, the object of a condemnation proceeding is to ascertain the just compensation to be paid. *Illinois State Toll Highway Authority v. Dicke*, 208 Ill. App. 3d 158, 171 (1991). Just compensation is the market value of the property adapted to its highest and best use on the date of the filing of the condemnation complaint (see, *e.g.*, *Department of Transportation v. White*, 264 Ill. App. 3d 145, 149-50 (1994)), and market value, in turn, is the amount that a purchaser would pay to the owner to buy the property in a voluntary sale (735 ILCS 30/10-5-60 (West 2008)).

¶ 68        As noted above, a property owner may claim, *separate* from the amount of just compensation for the land taken, that the remaining property was damaged by the taking. See, *e.g.*, *Oak Brook Park District v. Oak Brook Development Co.*, 170 Ill. App. 3d 221, 239 (1988) (the plaintiff exercised a taking through eminent-domain powers, and the defendant claimed damage to the remainder); *Department of Public Works & Buildings v. Horejs*, 78 Ill. App. 2d 284, 287 (1966) (the plaintiff filed petition to condemn, and the defendants claimed damage to the remainder); see also IPI Civil (2011) Nos. 300.11-300.15 (providing instructions in varying circumstances where counterclaims for damage to the remainder are filed or not filed, or amount is contested or not contested). The settled measure of damage to a remainder is the " 'depreciation in value of the land not taken which results from the taking, that is, the difference between the fair cash market value of the part not taken unaffected by the improvement and its fair cash market value as affected.' " *Dicke*, 208 Ill. App. 3d at 172 (quoting *Department of Public Works & Buildings v. Bloomer*, 28 Ill. 2d 267, 270 (1963)). Not all factors bringing about a reduction in value represent recoverable damages relating to land not taken; the depreciation must be from a direct physical disturbance of a right the owner enjoys in connection with his or her property. *Department of Transportation v. Rasmussen*, 108 Ill. App. 3d 615, 626 (1982).

¶ 69        Accordingly, there is no question that, to the extent that Dalzell's claim implicated just compensation and damage to the remainder as a result of the taking, the trial court was the proper forum. Indeed, IDOT never disputed this in a motion to dismiss the counterclaim for lack of jurisdiction. Instead, IDOT's challenge is based on the concept that, for damages to be compensable in an eminent-domain proceeding, they must be a direct and proximate result *of the taking* (*Dicke*, 208 Ill. App. 3d at 172), and if the alleged damage is not a direct and proximate result of the taking or if the property damaged is not taken, the property owner's remedy lies in the court of claims, which, again, has exclusive jurisdiction over all claims against the State for damages in any case sounding in tort, if such a case would lie against a private person in a civil suit. 705 ILCS 505/8(d) (West 2008); *Patzner v. Baise*, 133 Ill. 2d 540, 545 (1990). As such, IDOT frames the issue on appeal as the trial court's lack of jurisdiction to consider testimony concerning Dalzell's claim for damages relating to the North Avenue driveway's closure, which, it argues, was not a direct and proximate result of the taking.

¶ 70        However, in denying IDOT's motion *in limine*, the court clearly and correctly drew the proverbial "line in the sand" with respect to its jurisdiction. The court was aware that claims for damages against the State belong in the court of claims, and it expressly did *not* allow Dalzell to seek damages for the North Avenue driveway's closure. Indeed, the court *agreed* with IDOT that, if Dalzell wished to seek damages for the driveway's closure, he would have to proceed in the court of claims. However, the court also correctly recognized that the constitution and the Act contemplate that certain elements of claims regarding just

compensation and the corollary of damage to the remainder properly belong in the circuit court. The issue, therefore, is more nuanced than as framed by IDOT: namely, the issue is whether the court correctly determined that, although Dalzell could not elicit testimony concerning *damages* for the driveway's closure, the impact of that closure could nevertheless still be considered by appraisal experts and the jury in assessing the remainder's post-taking *fair market value*. Again, Dalzell's counterclaim did not request damages pertaining to the driveway; rather, it alleged that, because the remainder was used in common with the parcels taken, IDOT's condemnation actions decreased the *overall value of the remainder*. Therefore, the court found simply that the appraisers and the jury were not required to ignore that, because of the North Avenue driveway's closure, the Powis Road driveway became the *sole* driveway on the property. For the following reasons, we reject IDOT's argument that the court's ruling was improper, addressing first its cited authority and then its ancillary arguments.

¶ 71    IDOT cites several cases to argue that the court's ruling was improper, emphasizing that claimed damage to the remainder must be proximately caused by the taking. However, the cases upon which IDOT relies are unpersuasive because they either simply recount undisputed law or do not present analogous facts. For example, although certain claimed damages in some of the cases were denied because proximate cause between the taking and the alleged damages did not exist, the focus in those cases was on the fact that the damages sought were caused not by takings on the *owners'* properties but, rather, by takings or other events that occurred on the properties of *others*. See, *e.g.*, *Dicke*, 208 Ill. App. 3d at 171 (the owners were not entitled to damages for changed drainage on their property that resulted from the placement of dirt fill on another owner's adjacent property); *Department of Transportation v. Lake Ka-Ho, Inc.*, 98 Ill. App. 3d 1052, 1055 (1981) (damage from lake siltation was not compensable where the silt did not come from the property taken from the defendants but, rather, from improvements on the properties of others). Similarly, proximate cause did not exist where (1) the alleged damages were caused not by the taking on the owner's property but, instead, by an improvement placed on property across the street from the owner and (2) the resulting depreciation was suffered in common by *all* properties in the vicinity of the improvement. See *Horejs*, 78 Ill. App. 2d at 290-92 (although a portion of the defendants' property was taken for a frontage road as part of an overall project, the defendants could not claim as damage to the remainder an alleged interference with view, light, and air that was actually caused by an embankment that was placed *across the road* from their property on land acquired by the plaintiff from other property owners; the damages were not a result of the taking for the frontage road, and they were "suffered in common by all lands in the vicinity").[3]

¶ 72    Here, Dalzell is claiming damage, *i.e.*, a loss in value, to the remainder based solely on events that occurred on *his* property, and the issues here do not concern depreciation factors that affect the public at large. Further, in the above-mentioned cases, it was relevant that the alleged damages would have occurred *regardless* of any takings on the defendants' properties. Accordingly, the requirement that the damages be a direct and proximate result of a taking was not satisfied, because the damages were simply the result of construction in the general areas.

---

[3]In *Rasmussen*, 108 Ill. App. 3d at 624-27, a case cited by Dalzell, the court similarly found that damage to the remainder could not include the decrease in fair market value resulting simply from an overpass being built next to the defendants' property because that decrease would affect any land in the vicinity and the public at large.

Here, the counterclaim alleged damages and a reduction in value from the taking only on, and unique to, Dalzell's property.

¶ 73    IDOT also relies upon *Department of Transportation ex rel. People v. Interstate Brands Corp.*, 251 Ill. App. 3d 785, 788 (1993). There, the court answered in the negative the following certified question:

> " 'When an Eminent Domain proceeding brought by the State of Illinois involves the taking of a temporary easement, may the Defendant seek recovery by counterclaim for damages to the remainder based upon changes in access to the property, in a forum other than the Illinois Court of Claims?' " *Id.*

¶ 74    The facts given in *Interstate* do not fully describe the physical alterations to the property, but it appears that IDOT acquired a temporary easement through condemnation proceedings and also relocated an access driveway as part of the project. The relocated access driveway required that semi-trucks be given more maneuvering room and, consequently, resulted in a loss of parking spaces to the property owner. The property owner counterclaimed for damages for the loss of parking spaces. The court noted that (1) the counterclaim did not seek damages to the remainder resulting from the taking of the temporary easement, (2) it was not alleged that the property subject to the temporary easement was the same property on which the new access driveway was built, and (3) the damages (lost parking) due to the location of the access driveway did not directly relate to the temporary easement. *Id.* Therefore, the court concluded, the defendant could not "tag on" to an eminent-domain proceeding an action for damages that belonged in the court of claims. *Id.* at 789. The court reiterated that, where a loss does not involve the actual physical invasion of the property (*i.e.*, a taking), it is compensable in a common-law action for damages in the court of claims, not in an eminent-domain proceeding. *Id.*

¶ 75    At first blush, the certified question in *Interstate* seemingly speaks to the issue before us. However, for three reasons, *Interstate* does not change our opinion that there is no jurisdictional issue here. First, we note that, although *Interstate* purported to answer a certified question of law, it improperly did so, in large part, by basing its answer on the particular facts of the case rather than answering a question of law. See, *e.g.*, *Razavi v. Walkuski*, 2016 IL App (1st) 151435, ¶ 7 ("a Rule 308 [(Ill. S. Ct. R. 308 (eff. Jan. 1, 2016))] appeal is limited to answering a certified question of law and is not intended to address the application of the law to the facts of a particular case"). Second, to the extent that *Interstate* provided facts, they are distinguishable from those here. The court in *Interstate* apparently determined that there existed *no* relationship between the taking and the access issue that resulted in the claimed damages. Further, *Interstate* concerned a defendant property owner who was seeking compensable damages *only* for the condition that was not, apparently, related to the taking. Here, however, the trial court was *not* presented with a claim seeking damages for an access issue—*i.e.*, the closure of the North Avenue driveway—unrelated to the taking. Rather, the trial court was faced with the reverse: a claim for damage caused by the taking to the remainder *as impacted by* the driveway's closure. Therefore, and in part due to the procedural posture of *Interstate*, the court there was simply not presented with the question before us—*i.e.*, whether the change in access *could* be considered to the extent that it impacted the damages proximately caused by the taking and thereby affected the post-taking remainder value, even if damages for that changed condition could not be claimed or awarded in their own right. Third, as summarized in the above case law, it is simply undisputed that, where there is *no*

- 18 -

relationship between a taking and an access issue or other damages, recovery must be sought in the court of claims. Accordingly, to the extent that the court in *Interstate* held something different—*i.e.*, that there can never be a relationship between a taking and an access issue or that, if there is such a relationship, the access issue cannot impact damage to the remainder for purposes of an eminent-domain proceeding—we decline to follow it.

¶ 76    Accordingly, the aforementioned case law does *not* instruct that the trial court here erred, as a matter of law, when it allowed consideration of the driveway's closure for purposes of assessing post-taking remainder value. While it is clear that not every diminution resulting from a project necessarily also results from a taking that is a component of that project, the facts of this case demonstrate that the closure is interrelated with the damage to the remainder caused by the taking. In *this* case, the closure meant that the taking caused, as testified, a greater diminution than it would have otherwise. As a result, the calculation of that diminution properly included the closure.

¶ 77    We also reject IDOT's argument for other reasons. First, we reject its argument, raised for the first time in its motion to reconsider the denial of the motion *in limine*, that the appraisers *must* ignore the driveway's closure in their valuations because, on the date of valuation (*i.e.*, the date of the complaint's filing), the driveway remained open. While there is no dispute here that the date of the complaint's filing constitutes the date of valuation, we may deem this particular argument forfeited, as it was improperly raised for the first time in a motion to reconsider before the trial court. See *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36 ("Arguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal."). In any event, IDOT's argument takes an untenably narrow view of the idea that the post-taking valuation must be the value of the property as it existed "immediately" after the filing. We reject this idea, as did the trial court, in part based on IPI Civil (2011) No. 300.49, which provides:

> "In determining the fair cash market value of the remainder after the taking, you may consider [*any*] [benefits] [or] [*detriments*] from the *proposed public use*, proved by the evidence, which [increase] [or] [*decrease*] the fair cash market value of the remainder." (Emphases added.).

¶ 78    In our view, the valuation cannot include only the property's physical state *immediately* after the complaint's filing, without any consideration of what the taking and the project will entail, as it is likely that little of the project will have been physically completed "immediately" (however that term is defined) after a condemnation complaint is filed. For one thing, such an approach would provide incentive to delay a project. Moreover, if IDOT's argument were correct, IPI Civil (2011) No. 300.49 would not allow for consideration of the "proposed" public use.[4] Further, one of the comments to the instruction provides: "It is also proper to

---

[4]In fact, Kleszynski testified at trial that, regardless of when the North Avenue driveway was actually closed, he considered it closed as of the date of his valuation "because that is the way it's done. It's—the presumption is that on the date of value in the after condition the project is complete and the driveway would be closed. That is the technique that is applied." We suspect that the concept of valuing property as of the date that a condemnation complaint is filed serves to account for possibly *unrelated* circumstances affecting property values (*e.g.*, natural disasters, zoning changes, etc.) before the condemnation suit has proceeded to judgment, as opposed to creating a split-second snapshot for assessing value irrespective of any damages resulting from the proposed public use.

consider detriment to the remainder which is *reasonably certain to result* from the *use to be made* of the part taken." (Emphases added.) IPI Civil (2011) No. 300.49, Comment, at 586. We also note that the comments to IPI Civil (2011) No. 300.45 reflect that, while not all factors bringing about depreciation represent recoverable damages relating to land not taken, some items that are *not* recoverable themselves *may* remain relevant as evidence of the depreciation. See IPI Civil (2011) No. 300.45, Comment, at 586 (citing *Bloomer*, 28 Ill. 2d 267, for the proposition that "[t]he expenditures made and costs incurred by the landowner in adapting the remainder to use after the takings are *relevant*, if reasonable and economical, as *evidence of the depreciation in value*, but *not* as recoverable items in themselves" (emphases added)). Although we are not presented here with a "cost of cure" issue, we find that the foregoing supports the trial court's position that an appraisal of value need not completely ignore relevant factors, even if those factors are not, themselves, recoverable as damages in the proceeding.

¶ 79        We also note that, at the quick-take hearing, both parties presented expert appraisal witnesses whose assessments of the fair market value of the property *in fact* considered the closure of the North Avenue driveway. Lorenz explained that, although he did not attribute a damages amount for the driveway's closure, he "didn't think it was appropriate to ignore it. It was a part of the taking, part of the improvement." Similarly, MaRous testified that (1) he knew of no appraisal practice that would ignore the closing of a driveway in a condemnation project, (2) it is customary in any appraisal report to include the number of driveways or access points to the subject property, and (3) "a driveway for most properties is a very important fact. *** [P]roperties that have *limited access generally have a direct reflection of a lower value*."[5] (Emphasis added.) Therefore, when the court ruled on IDOT's motion *in limine*, its finding that the driveway's closure was a relevant factor to post-taking valuation was supported by the evidence it had previously received.

¶ 80        In sum, we see no jurisdictional error here concerning the closure of the North Avenue driveway. We do not disagree with the general proposition that "the actual taking or the use of the part actually taken must be the direct physical cause of the damage to the remainder." *Horejs*, 78 Ill. App. 2d at 291. Neither did the trial court, which did *not* find that Dalzell could seek here damages for the North Avenue driveway's closure. However, the law (and the jury instructions) clearly anticipates that a common corollary to a circuit court eminent-domain action might be a counterclaim seeking compensation for damage to the remainder caused by the taking. Accordingly, here, the court considered that, after the taking, the Powis Road driveway was the sole means of ingress to and egress from the property. It properly found that, in resolving the question of compensation for damage to the remainder, the valuation evidence could include that pre-taking there were two driveways and post-taking there would be only one, which would be only a right-turn-in, right-turn-out access point. Under the facts of this

---

        [5]IDOT asserts that the quick-take evidence is irrelevant and should be disregarded. It correctly notes that section 20-5-10(d) of the Act provides that the preliminary finding of just compensation from the quick-take hearing shall not be evidence in further proceedings, nor shall the reports of appointed appraisers be evidence in further proceedings, although the appraisers may be called as witnesses. 735 ILCS 30/20-5-10(d) (West 2014). However, our reference to testimony from the quick-take hearing does not concern admission of evidence or implicate estoppel to IDOT from its witness's appraisal approach. Rather, we reference the testimony to the extent that the appraisers' approach to valuation at the quick-take hearing informed the court in its consideration of the factors that the post-take property assessment should include.

case, where the closure was relevant to assessing damage to the remainder that resulted from the taking, the court did not err in denying IDOT's motion *in limine* No. 1.

¶ 81                                   B. Safety of the North Avenue Driveway

¶ 82     IDOT argues next that the trial court abused its discretion with respect to rulings involving the safety of the North Avenue driveway. Specifically, it contends that the court abused its discretion in granting Dalzell's motions *in limine* to effectively bar Ziegler's testimony related to design speed and any exhibits related thereto (Dalzell's motions *in limine* Nos. 8, 9, and 10 and IDOT's exhibits Nos. 34, 35, 48, and 49), granting the motions as a Rule 219(c) sanction, and granting Dalzell's oral motion to bar IDOT's cross-examination of Abrams about design speed or tests based upon design speed. IDOT also asserts that the court should not have permitted Abrams to testify that the North Avenue driveway was safe, while limiting, on the basis that it would run afoul of the court's ruling on design speed, Gallenbach's testimony to the contrary. In sum, IDOT contends that it produced the design-speed information "once [it] understood that Mr. Abrams did not know and disputed the design speed in the before condition, [at which time] IDOT's counsel asked IDOT for any documentation it could find related to what Mr. Abrams said he was looking for in his deposition." IDOT then "voluntarily, without court order," produced the documents to Dalzell "only *nine days*" (emphasis in original) after they were located and more than one year prior to trial. IDOT asserts that, upon receipt, Dalzell could have Abrams supplement his report and opinion with the correct design speed but, instead, Dazell moved to bar the information one year later, right before trial and, in doing so, engaged in gamesmanship.

¶ 83     We review for an abuse of discretion both a trial court's ruling on a motion *in limine* and its decision to impose Rule 219(c) sanctions. *County Line Nurseries & Landscaping, Inc. v. Glencoe Park District*, 2015 IL App (1st) 143776, ¶ 42; *Diamond Construction*, 327 Ill. App. 3d at 342-43. An abuse of discretion occurs where no reasonable person would adopt the trial court's view. *Santorini Cab Corp. v. Banco Popular North America*, 2013 IL App (1st) 122070, ¶ 21. When imposing sanctions, the trial court must consider the surprise to the adverse party, the prejudicial effect of the witness's testimony, the nature of the testimony, the diligence of the adverse party, the timeliness of the objection, and the good faith of the party seeking to offer the testimony. *Id.* However, no one factor is determinative, and each case presents unique facts. *Id.*

¶ 84     We find no abuse of discretion in the trial court's rulings *in limine* or its imposition of sanctions. In 2011, 2012, and 2013, Dalzell issued discovery requests seeking from IDOT prior construction plans for North Avenue and Powis Road that included Dalzell's property. It is apparently undisputed that, although those requests did not specifically mention design speed, production of the plans would have included the design-speed information. It is also apparently undisputed that IDOT did not produce those plans, objecting to the requests as burdensome and irrelevant and, at one point, representing that those documents had been destroyed. When Dalzell later made a specific request, after discovery closed, for design-speed information, IDOT objected. But in February 2015, after Abrams had issued his report and had been deposed, IDOT's counsel requested from IDOT the very information that Dalzell had been seeking since 2011.

¶ 85     The trial court found outrageous that, in December 2014, IDOT objected to the request for the information as untimely but then, when it "understood" *why* Dalzell wanted the

information, IDOT finally requested it, easily obtained it, and produced it. The court found outrageous that IDOT intended to use the information both to support Ziegler's opinion and to rebut and critique Abrams's opinion as based on an incorrect design speed, when IDOT failed to earlier produce the information. The court questioned whether the information would have ever been produced had it not supported IDOT's own witness. We agree. We submit that it is *also* outrageous that IDOT failed to produce the plans in response to Dalzell's *earlier*, general discovery requests between 2011 and 2013. It matters not that IDOT did not then know that Dalzell wanted the plans for the design-speed information. Clearly, producing the plans would not have been burdensome, they were not irrelevant, and they had not been destroyed, as they were easily retrieved when IDOT's counsel deigned to request them. If they had simply been produced between 2011 and 2013, Dalzell would not have needed to incur additional expense, pursuing discovery requests and filing motions to exclude. (Nor, frankly, would additional taxpayer money have been expended for IDOT to respond to those motions and to further pursue and resolve this issue.)

¶ 86       IDOT argues that, ultimately, Dalzell received the documents one year prior to trial and, therefore, cannot claim surprise or prejudice. It contends that a lesser sanction would have been appropriate. We disagree. First, we note that, according to Dalzell, although the design-speed information was produced with Ziegler's rebuttal opinion in March 2015, the information was included within more than 1000 pages of attachments, not specifically identified, and Dalzell did not know that it had been produced until Ziegler mentioned it in his November 2015 deposition. Second, and more importantly, *other* witnesses had relied on Abrams's opinion. Thus, even if Dalzell had pursued the additional expense of having Abrams revise his opinion to account for the information, which IDOT possessed but failed to previously disclose, Dalzell would have had to pursue the additional expense of having the other witnesses modify their opinions that were based on Abrams's previous opinion. Presumably, IDOT would then have requested an opportunity to rebut all the revised opinions. The far more just (and certainly reasonable) decision, we agree, was for the trial court to simply exclude the testimony from *both* experts that relied upon design speed.[6]

¶ 87       Critically, testimony concerning the North Avenue driveway's safety was *still permitted*; the experts were allowed to opine on its safety to the extent that their conclusions were based on factors other than design speed. Under these unique facts, it is clear that the safety of the driveway was relevant only to the extent that it impacted the property's value and, in turn, the extent to which the remainder was damaged when Powis Road's driveway became the sole access point on the property. We disagree, therefore, with IDOT's contention that the discovery sanction deprived it of a full trial on the merits. The jury was not deprived of information with respect to the driveway's safety; instead, the experts were allowed to opine on safety, excluding design speed. Accordingly, we cannot conclude that no reasonable person would agree with the trial court's rulings, and we reject IDOT's challenge to the court's decision to bar design-speed testimony and its resulting decisions consistent therewith.

¶ 88       IDOT also asserts that the trial court abandoned its role as gatekeeper when it announced that Abrams could testify that his safety opinion was based on "a yellow duck." Again, we disagree. IDOT takes the court's comment out of context. IDOT challenged at trial the bases

---

[6]Incredibly, IDOT asserts that it "should be allowed at a new trial to cross examine Mr. Abrams on his admitted incorrect opinion of the design speed of North Avenue in the before condition."

for Abrams's safety opinion, arguing that they were not adequately disclosed. After Dalzell produced Abrams's previous reports and testimony, Dalzell and IDOT agreed that Abrams had disclosed and could testify to three bases for safety that did not include design speed. IDOT's counsel represented that, as long as Abrams testified to those three things, counsel would not further object. Thereafter, however, IDOT's counsel asserted that one of the bases might be irrelevant, simply due to the passage of time. The court responded, "That is cross-examination. No, it doesn't matter. No. That is the bas[i]s." IDOT's counsel replied, "I got you." The court continued, "He could say that I looked at this yellow duck and then I came to this opinion. You may think it's ridiculous that that would be a basis for his opinion. So that is a matter of cross-examination." Accordingly, in context, it is clear that the court was simply informing IDOT that, since the basis had been disclosed, the alleged inadequacy of the basis was subject to cross-examination, not exclusion. Abrams did not, in fact, base his opinion on looking at a yellow duck. The court's comment was simply rhetorical, and it did not abandon its gatekeeper role. Further, we are, at this point, discussing minutiae. Again, the safety of the North Avenue driveway was relevant only to the extent that it impacted its value as related to the remainder. The point of Abrams's testimony was simply that he viewed the driveway as safe, and IDOT agreed that three bases for that opinion were disclosed. We must, therefore, reject IDOT's argument that it was denied a fair trial by this isolated comment relating to a single basis for a safety opinion that was of marginal relevance to this case.

¶ 89    Similarly, we reject IDOT's argument that the court was biased and erred where, based on its design-speed rulings, it sustained an objection to Gallenbach's testimony concerning motorists "coming over the crest of the bridge" but allowed Abrams to testify that the driveway was safe where he "considered, you know, basically the distance, you know, from the top of the hill to the driveways." Again, IDOT takes Gallenbach's testimony and the court's ruling out of context, as it does not present Gallenbach's entire statement. Specifically, Gallenbach testified that he based his safety opinion partly on "what kind of reaction time would a motorist have looking to the east to make a decision to go eastbound or if the vehicles coming over the crest curve of the bridge would they have to slow down below ten miles an hour, really hit the brakes." Dalzell objected that the "stopping site distance" was based on site-distance analysis, a test that relied on design speed. The court sustained the objection. Given the full context of the quotation, we cannot find that the court's decision was an abuse of discretion.

¶ 90                    C. Dalzell's Motion *In Limine* No. 14

¶ 91    IDOT argues next that the trial court abused its discretion when it granted Dalzell's motion *in limine* No. 14. Specifically, IDOT argues that the court should not have barred other witnesses from discussing Gallenbach's opinion. IDOT asserts that Gallenbach was timely disclosed, Dalzell moved to depose him, and IDOT was granted leave to supplement its disclosures based on Gallenbach's testimony. IDOT contends, "It is hardly fair to limit testimony that a party sought and obtained via a court order on a motion to compel simply because it is unfavorable to that party." IDOT argues further that the other witnesses could not buttress Gallenbach because they were not permit engineers and, therefore, had different perspectives. For the following reasons, we reject IDOT's argument.

¶ 92    First, we address forfeiture. Dalzell notes that IDOT objected to his motion but did not further preserve the claim for appeal. Indeed, in civil cases, when the court rules before trial concerning the admission of evidence, a contemporaneous trial objection or offer of proof

- 23 -

must be made to preserve a claim of error for appeal. See Ill. R. Evid. 103(b)(3) (eff. Oct. 1, 2015); *People v. Denson*, 2014 IL 116231, ¶ 23. IDOT did not make offers of proof at trial addressing the barred testimony, namely, what the other witnesses would have said about Gallenbach's opinion had they been allowed to do so. This claim is, therefore, forfeited.

¶ 93   Second, in any event, we would not find that the court abused its broad discretion in determining that IDOT's other witnesses could not incorporate Gallenbach's opinion into their own, when his opinion did not even exist when their opinions were formulated. The ruling limited the extent to which other witnesses could claim to have relied on that opinion. Therefore, the issue was not other witnesses buttressing Gallenbach; rather, the court determined that it would be inappropriate to buttress the *other* witnesses by allowing them to claim that Gallenbach's opinion supported their own. We cannot find that this decision constituted an abuse of discretion.

¶ 94                    D. Motions and Instructions Regarding Barrier Median

¶ 95   IDOT argues next that the court erred as a matter of law when it denied IDOT's motions concerning the barrier median, circuity of travel, and material impairment of access (and, in turn, when it granted Dalzell's motion *in limine* concerning material impairment of access), and, further, that the court abused its discretion when it refused jury instructions about the barrier median and circuity of travel. IDOT argues that, pursuant to *Wilson*, 62 Ill. 2d 131, and *Mabee*, 22 Ill. 2d 202, Dalzell is not entitled to compensation because his free and direct access to the lane of traffic abutting his property on Powis Road has not been taken or impaired; rather, the installation of a barrier median simply controls the direction of travel. We disagree.

¶ 96   We note first that Dalzell asserts that IDOT forfeited these issues by failing to contemporaneously object at trial and IDOT does not directly reply to that assertion. However, given the interrelated nature of the issues presented by the motions *in limine* and the jury instructions, we choose to consider the issues to have been arguably (and tenuously) preserved at trial by (1) IDOT's oral motion to strike any testimony concerning the 3.5-mile route and (2) its pursuit of IPI Civil (2011) No. 300.51 concerning the barrier median.

¶ 97   We review for an abuse of discretion a trial court's ruling on a motion *in limine*. *Diamond Construction*, 327 Ill. App. 3d at 342-43. However, the question whether there has been a taking or material impairment of access that entitles the property owner to compensation is a question of law for the trial court to determine in the first instance. *Wilson*, 62 Ill. 2d at 141. The jury must then decide the extent of the resulting damages. *Id.* at 142.

¶ 98   Here, the trial court did not err in determining that there had been a taking and material impairment of access at the Powis Road driveway. First, there was, undisputedly, a taking. Second, the court properly found that the reduced driveway size, coupled with the insurmountable median and resulting 3.5-mile route, materially impaired access. The extent of the damages resulting from the taking and impairment was a matter properly left to the jury.

¶ 99   We agree with the trial court's determination that IDOT's cited cases do not speak to the combination of factors present here. In *Wilson*, the court reviewed compensable and noncompensable actions affecting access and determined that "the rule is that[,] if there has been a taking or material impairment of access, then it is appropriate for the jury to consider that fact in determining the extent of damages to the remainder in an eminent domain proceeding." *Wilson*, 62 Ill. 2d at 144. The court held, on the facts before it, that the trial court had not erred in determining that a partial taking, which eliminated direct access to a major

road but replaced it with a frontage road, was a material impairment and that the extent of damages was a consideration for the jury. *Id.* at 145.

¶ 100    Likewise, IDOT's heavy reliance upon *Mabee* is misplaced. First, in *Mabee*, unlike here, there was no taking. Second, the property owner in *Mabee* operated a gas station and argued that the construction of an insurmountable median on the portion of highway abutting one side of the property limited access to a one-direction traffic flow, reducing the volume of business and, to an extent, the value of the property. The court found first that the property owner was not entitled to an optimal flow of traffic and that inconveniences from the median, which ran the length of a roadway, were the same as those shared by the public generally. *Mabee*, 22 Ill. 2d at 204. The court next found that the property owner's right of access had not been damaged because he maintained free and direct access to the lane of traffic abutting his property, which had not been "taken or impaired." *Id.* Here, however, Dalzell makes no argument concerning damages due to the changed flow of traffic. Further, here a taking touched the access point on Powis Road that connects to the lane abutting Dalzell's property. Finally, Dalzell's property is the *only* property affected by the barrier median and the reduced driveway size; the median does not extend down the length of the roadway such that the inconvenience is shared by the public generally.

¶ 101    *Mabee* was also distinguished in *Rasmussen*, 108 Ill. App. 3d at 621, and *Illinois State Toll Highway Authority v. Humphrey Estate*, 62 Ill. App. 3d 316, 322-23 (1978), in which courts recognized, on facts more similar to the facts presented here, that the situations involved more than a mere regulation of traffic pursuant to the State's police power. In *Rasmussen*, before construction, vehicles exiting the property could drive directly onto a major road and proceed in a certain direction; after construction, they were forced to travel in a certain direction to one road, turn and drive one block in another direction, turn again onto a connecting street, and then drive another block in the other direction to access the major road. The court rejected the argument that the construction resulted in mere circuity of travel, shared by the public generally, and that the decrease in property value was, therefore, not compensable. *Rasmussen*, 108 Ill. App. 3d at 621. The court found particularly significant that the physical effects of the construction on the property paralleled the effects of erecting barricades along the road in a manner that materially impaired the ingress to and egress from the property. *Id.* at 622-24. Similarly, in *Humphrey*, among other things, the property owner's access rights to abutting roads were limited and/or taken, and one road was converted to a dead-end road. As a result, to gain access to the largest quadrant of the owner's land, drivers were forced to travel along one road to another and then proceed for at least 120 feet. *Humphrey*, 62 Ill. App. 3d at 318-19. The court held that there was "no question" that the owner's access rights had been "materially impaired." *Id.* at 323. Therefore, we agree with the trial court here that, where Dalzell and his customers must travel 3.5 miles (more than 18,000 feet) to access abutting North Avenue, the circumstances involve more than simply an exercise of State police power resulting in a circuitous route that affects the public generally. The court did not err in finding a taking and material impairment of access.

¶ 102    Accordingly, IDOT's arguments concerning the jury instructions must also be rejected. Whether to provide a certain jury instruction lies within the trial court's sound discretion. *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1020 (2006). It is for the trial court to evaluate whether a jury instruction is applicable, is supported by record evidence, and accurately states the law. *Id.* at 1021. Ultimately, the court's jury-instruction rulings do not reflect an abuse of

discretion if the instructions given at trial, taken as a whole, fairly and fully apprised the jury of the relevant legal principles. *Id.* "A new trial will be granted based on the court's refusal to give a proposed instruction only when that refusal has caused serious prejudice to a litigant's right to a fair trial." *Id.*

¶ 103　　As to IDOT's submission of IPI Civil (2011) No. 300.51, which, again, states that "[t]he law does not permit an award of damages for the *loss or reduction of traffic* which may result from [the installation of a median or divider strip] [the establishment of a one-way traffic regulation], and you should not consider this factor in determining damages to the remainder" (emphasis added), the court did not abuse its discretion in finding that the instruction concerns damages from flow of traffic, an argument not raised by Dalzell and not based on the evidence before it and therefore would potentially confuse the jury.

¶ 104　　The court also did not err in rejecting IDOT's non-IPI instruction that "[t]he law does not permit an award of damages for circuity of travel." A court's decision to refuse a non-IPI instruction should not be disturbed absent an abuse of discretion. *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 33. Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013) provides that applicable IPI instructions shall be given; non-IPI instructions may be given if the IPI instructions do not accurately state the law or if they do not cover a subject upon which the jury should receive instruction. The court did not abuse its discretion in determining that the jury did not require this instruction, which, as seen from the foregoing case discussion, reflects an oversimplification of the law (as well as an oversimplification of *Greenwell*, 45 Ill. App. 3d 159), and that the instructions provided to the jury accurately reflected the relevant legal principles.

¶ 105　　　　　　　　　　　　E. Opening and Closing Statements

¶ 106　　IDOT argues next that Dalzell's counsel, in opening and closing statements, inappropriately invited the jury to render its verdict based on prejudice and sympathy. Specifically, IDOT asserts that counsel improperly touched on issues, such as responsibility and accountability, that fell outside the sole issue to be decided, *i.e.*, just compensation. It asserts that the comments also improperly dwelt at length upon the jury's duty to award just compensation, lest *it* violate Dalzell's constitutional rights; invited the jury to award damages for the closure of the North Avenue driveway; and violated the court's instruction that the jury afford both sides fair consideration. IDOT concedes that it offered no objection at trial to counsel's arguments. However, IDOT asserts that we should review the issue for plain error because the comments deprived it of a fair trial and substantially impaired the integrity of the judicial process.

¶ 107　　The plain-error doctrine may be applied in civil cases, but it finds much greater application in criminal cases. See *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶ 37. Indeed, "application of the plain[-]error doctrine to civil cases should be exceedingly rare." *Id.* The doctrine may be applied in civil cases only where there exists a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process. *Id.* Our supreme court has stated that, in a civil case, the forfeiture doctrine will be strictly applied unless the "prejudicial error involves flagrant misconduct or behavior so inflammatory that the jury verdict is a product of biased passion, rather than an impartial consideration of the evidence." *Gillespie v. Chrysler Motor Corp.*, 135 Ill. 2d 363, 375-76 (1990).

- 26 -

¶ 108 Here, Dalzell argues that IDOT's arguments must fail. He asserts that IDOT's failure to object at trial to *any* of the "selective" comments with which it takes issue on appeal reflects that the comments were simply not so egregious that IDOT was deprived of a fair trial or that the integrity of the judicial process was impaired. Dalzell notes that the terms "responsibility" and "accountability" are particularly innocuous in eminent-domain settings because IDOT is, in fact, undisputedly "accountable" for any damages and "responsible" for paying just compensation. Dalzell asserts that, in a case such as this, referencing a property owner's constitutional right to just compensation from a condemnor who is, in fact, accountable for damages it caused cannot be considered an appeal to a jury's "base emotions of prejudice and sympathy." We agree.

¶ 109 We are not convinced that any of the comments that IDOT highlights necessarily constitute error, let alone prejudicial error or flagrant misconduct so egregious that IDOT was deprived of a fair trial, the integrity of the judicial process was impaired, and there is a likelihood that the jury's verdict resulted from biased passion. In contrast, for example, the plain-error doctrine was applied and a new trial awarded for the first time in a civil case by the supreme court in *Belfield v. Coop*, 8 Ill. 2d 293, 312-13 (1956), where the plaintiff's counsel referred to the defendants as "thieves," "usurpers," and "defrauders," suggested that defense counsel was disreputable, and further suggested that the jury should find for the plaintiff because he was a former judge. Dalzell's mere references to responsibility and accountability are markedly different from the implications of immorality found flagrantly improper in *Belfield*. Further, this case is markedly different from *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585-86 (1993), another case cited by IDOT. In *Zoerner*, a panel of this court, despite forfeiture, concluded that a closing statement deprived the plaintiff of a fair trial where, although the jury's sole task was determining proximate cause, the defense attorney emphasized that drinking and driving was wrong and then impressed upon the jury's sense of moral outrage by asking it to reach a certain verdict because it would send a message against drunk driving and punish the plaintiff for antisocial behavior. Here, IDOT's accountability for the taking and damages and its responsibility to pay just compensation are simply not controversial themes. Therefore, referencing those concepts did not unfairly impugn IDOT's "character" or inflame the jurors' passions and sympathies. The subject of the North Avenue driveway was controversial, but the parties' stipulation permitted discussion concerning its value and, ultimately, safety, which IDOT also raised through its evidence and in argument. Further, the jury was instructed that (1) opening and closing statements are summaries and should be disregarded if not based on the evidence or supported by the law, (2) it should not consider IDOT's right to take the property, (3) fair consideration should be given to both parties, and (4) it should not be swayed by prejudice or sympathy. As such, the instructions safeguarded against any prejudice that might theoretically have arisen from the challenged comments.

¶ 110 In sum, for the foregoing reasons, this civil case does not present the "exceedingly rare" scenario warranting application of the plain-error doctrine. IDOT's challenges to the opening and closing statements are forfeited.

¶ 111                    F. Kleszynski's Valuation Testimony

¶ 112 IDOT argues that the trial court abused its discretion when it denied the motion to strike Kleszynski's valuation testimony. Specifically, IDOT argues that Kleszynski improperly responded to the jury's question with an example that did not follow proper valuation

methodology for a partial taking because he valued the part taken as a tract of land separate and distinct from the whole. See *Department of Transportation v. Kelley*, 352 Ill. App. 3d 278, 281 (2004) (the part taken must not be valued as a separate tract from the whole). IDOT asserts that Kleszynski's testimony was inconsistent and lacked veracity because he assigned the part taken a higher value per square foot than the property as a whole but then testified that, if one considers a strip of land completely divorced from the whole, its value would decrease. IDOT contends that the testimony relied on improper valuation methodology and should have been stricken and that it should be granted a new trial. We disagree.

¶ 113    First, we note that IDOT's trial objection to this testimony concerned disclosure of the testimony, the example of signage, and alleged juror confusion. IDOT did not object on the basis that the testimony reflected improper valuation methodology. As such, we may deem this argument forfeited. *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 25 (arguments not raised before the trial court are forfeited and cannot be raised for the first time on appeal).

¶ 114    Second, even if not forfeited, the argument fails. We review for an abuse of discretion a trial court's decision to strike an expert's testimony. See, *e.g.*, *In re Marriage of Hunter*, 223 Ill. App. 3d 947, 955 (1992) (trial court did not abuse its discretion where it refused to strike an expert's testimony as based upon hearsay).

¶ 115    Here, IDOT's argument regarding improper valuation methodology relies upon a mistaken premise, *i.e.*, that Kleszynski valued the part taken separate from the whole, thereby misrepresenting the value of the part taken. As acknowledged by the trial court, Kleszynski made clear (on multiple occasions) that he assessed the value of the part taken in terms of its contributory value to the property as a whole. He explained that various parts of a property have different contributory values to the whole and that the part taken here had a higher contributory value to the whole than would a different portion of the property. We do not find this concept inconsistent with Kleszynski's testimony that valuing a small strip of land in *total* isolation would result in a lower value for that strip of land. Therefore, the court did not abuse its discretion in denying IDOT's motion to strike the testimony.

¶ 116                              G. Dalzell Cross-Examination

¶ 117    IDOT next argues that the trial court abused its discretion when it sustained Dalzell's objection to cross-examination concerning his income. IDOT contends that its reliance on *Shell Oil* was sound and that it should have been allowed to pursue this line of questioning to discredit Dalzell and "destroy" his direct testimony that ingress and egress were worse after the taking. "IDOT was prejudiced because the jury could have found Mr. Dalzell's testimony regarding ingress/egress not credible because his income largely remained the same." IDOT asserts that it should be granted a new trial.

¶ 118    Evidentiary issues, including determining the scope of a witness's cross-examination, fall within the trial court's sound discretion. *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889, ¶ 70.

¶ 119    The court did not abuse its discretion in finding that this case concerned the market value of the property itself, not Dalzell's income that he generates from the property. The court found that there was no discovery concerning Dalzell's income before and after the taking. Dalzell was not claiming damages due to loss of income. Rather, he was claiming that physical alterations to the property affected ingress and egress. Therefore, where the evidence

concerned only the valuation of the property itself, not Dalzell's business income, the court did not abuse its discretion in sustaining Dalzell's objection to IDOT's income question.

¶ 120    We note that IDOT's reliance on *Shell Oil* is misplaced. There, the property had the same number of entrances before and after the taking, but the driveways were made smaller, and vehicles needed to make sharper turns in order to enter. *Shell Oil*, 156 Ill. App. 3d at 306. IDOT's motion *in limine* to *exclude* testimony relating to the volume of sales was denied. Shell, therefore, presented evidence that, after the taking, an average of 34,000 gallons of gasoline were shipped each month to the station, whereas, before the taking, an average of 55,300 gallons had been shipped each month. Further, Shell presented a witness who testified to the value of the property taken as well as the value of the remainder, noting that "he took the decreased sales into account, but he viewed the decreased sales only as an indication that the taking substantially impaired access to the station. He testified that ease of ingress is of primary importance in determining the value of a service station." *Id.* The court held that the evidence was properly admitted, noting that the witness relied on sales figures solely as substantiation of Shell's claim that access to the station was worsened by the taking. *Id.* at 308.

¶ 121    Therefore, in *Shell Oil*, where the same number of entrances to the property existed after the taking and no barrier median or other impediment was at issue, Shell could substantiate its claim to a material impairment of access *only* by showing decreased sales. Further, Shell's witness had relied upon decreased sales in his valuation opinion, and he testified, without objection, that ease of ingress is of primary importance for determining the value of a service station. *Id.* at 306. In contrast, here, the access issues were clearly established without any need to resort to income. Further, no expert here relied on income or sales to derive a valuation opinion. Again, the valuation at issue here was of the property, *not* the business. Therefore, had the cross-examination been allowed, the jury would have been forced to reconcile on its own whether any changes in income (or lack thereof) impacted the valuation opinions that it had received. Further, the court properly noted that changes in income could relate to many factors other than access and that, therefore, such testimony could cause unfair prejudice not outweighed by any probative value. In sum, the court's decision to sustain the objection was not an abuse of discretion.

### H. Abrams's Remedy Plan

¶ 123    IDOT argues that the trial court abused its discretion when it allowed Abrams to testify to his remedy plan because Abrams's opinion that Dalzell would need to obtain permission from his neighbor in order to implement the remedy plan was not disclosed pursuant to Rule 213(f)(3). IDOT asserts that the only thing Dalzell pointed to in support of disclosure was a demonstrative exhibit. IDOT finally asserts that the court's ruling was unfair in that it allowed Dalzell to sabotage his own remedy plan by suggesting that it could not be implemented.

¶ 124    We cannot find an abuse of discretion in the court's decision to allow Abrams's remedy-plan testimony. Apparently, the remedy plan contemplated Dalzell's use of his neighbor's property. That the use of the neighbor's property would require some form of permission is, as counsel noted, more akin to fact than opinion. We reject IDOT's feeble argument that the ruling was unfair in that it allowed Dalzell to sabotage his own remedy plan. Pointing out the steps that would need to be taken to implement the plan does not equate to an assertion that those steps could not be completed. In sum, we cannot find unreasonable the court's decision that the testimony reflected a common-sense implication of a demonstrative

drawing disclosing a remedy plan.

¶ 125                                  I. Cumulative Error

¶ 126        In its reply brief, IDOT raises for the first time an argument that cumulative errors warrant a new trial. As this argument was improperly raised in the reply brief, we need not address it. An appellant's arguments must be made in its opening brief and cannot be raised for the first time in the reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); see also *In re Marriage of Winter*, 2013 IL App (1st) 112836, ¶ 29.

¶ 127        In any event, while no litigant is assured a perfect trial, the litigant must not be denied a fair trial. *Andes v. Lauer*, 80 Ill. App. 3d 411, 416 (1980). As such, while individual errors standing alone might not be sufficient to require a new trial, cumulative errors can be so prejudicial as to justify a new trial. *Id.* However, "[a]s we find no error, we necessarily find no cumulative error." *In re Estate of Mankowski*, 2014 IL App (2d) 140154, ¶ 63.

¶ 128                                  III. CONCLUSION

¶ 129        For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 130        Affirmed.